LITTLETON P. MITCHELL, Appellant, v. THE DELAWARE
ALCOHOLIC BEVERAGE CONTROL COMMISSION, Appellee.

*(May* 31, 1963.)

(Withdrawn, corrected, revised and refiled June 21, 1963)

LYNCH, J., sitting.

LOUIS L. REDDING for Appellant.

GEORGE GRAY THOURON for Commission.

Superior Court for New Castle County, No. 1107, Civil Action, 1959.

LYNCH, Judge.

This is an appeal from a decision of the Commission, refusing to grant applications made by Appellant, a Col-

ored Person, for licenses for the sale of alcoholic liquors for consumption on and off Appellant's premises, located on the Delaware City-Port Penn Road, in Polktown, an area adjacent to the Town of Delaware City, Delaware. Appellant's premises are located about 75 yards south of the limits of said Town of Delaware City, on the principal north-south highway into and through that town.

No hearing was had by the Commission for the purpose of consideration of such application. Such hearings are not required by law, since 4 *Del. C.* § 541(a) requires only that:

"The Commission shall examine all applications for license as promptly as possible, and if it appears that any application should not be granted, the Commission shall so notify the applicant, stating the cause for refusal, and shall return the amount paid by the applicant."

The Supreme Court of this state, *DeMarie v. Commission,* 1 Storey 206, 143 A.2d 119 (1958) said *inter alia* in this connection (1 Storey at 210, 143 A.2d at p. 121):

"* * * it becomes clear that *only when the Commission has determined,* except for the filing of a protest, *to grant an application, is it provided that the Commission must give the persons making the protest an opportunity to present their objections. The statute does not provide for a hearing in any other eventuality and no implication to that effect may be read therein.*" (Emphasis supplied.)

In considering Appellant's applications, the Commission considered information prepared by the Commission's employees listing the names, addresses and mileage from Appellant's premises of presently licensed outlets. This information as certified to the Court showed only that there are presently four licensed establishments within one mile of Applicant's proposed outlet. It also showed

that Appellant's premises were located "approximately 0.2 of a mile" from a church and a school[1]. Based upon its consideration of the record before it, the Commission denied the applications for licenses, giving the following reasons:

(1) There are already sufficient licensed premises in the locality to provide people who live in the community with a reasonably convenient opportunity to make a legal purchase of alcoholic liquor.

(2) There is insufficient unsupplied public demand in the locality for the sale of alcoholic liquor.

(3) No other objection was raised or noted as to the legal sufficiency of the application or the information appearing therein.

Appellant docketed his appeal from the Commission's ruling. In his appeal papers, Appellant stated his grounds of appeal:

1. The Commission "abused its power to grant 'licenses' in refusing the applications * * * without a just cause".

2. The Commission erred "in finding as a fact that there are sufficient licensed premises in the locality for which the present licenses are sought", and in concluding "that the granting of the licenses is not demanded by public convenience or necessity within the meaning of the statutes" of the State of Delaware.

---

[1]It is to be noted that the location of the church and the school was not given by the Commission as a reason to deny the applications. This is only a permissive ground of refusal. Title 4 *Del. C.* § 543(d). It appears, post p. 300, the church and school did not appear to the Commission as sufficiently important reasons to deny applications for licenses for the same premises on prior occasions.

3. The Commission erred "in refusing to grant the licenses" because—

"(a) There are no licensed premises in the Town of Delaware City or its immediate environs which served colored persons * * * alcoholic liquor for consumption on the premises, and there are approximately 350 adult persons of such description in Delaware City and its immediate environs, the area which would be accommodated by such a licensed establishment.

"(b) There was formerly on the premises for which [Appellant] now seeks licenses, a taproom operating under the same kinds of licenses for which this application is made, and the circumstances with reference to the proximity of said licensed premises to church and school were the same at that time as now exist."

4. The action of the Commission "in refusing the application, under the circumstances, amounts to a denial of equal protection of the law."

██ It must be stressed here that Appellant does not contend his applications were refused because he is a Negro; it nowhere appears in the appeal papers or in the record of the Commission's proceedings that this point was presented or considered, so the Court will accept the testimony of the Commission that this was not a factor in the Commission's ratings.

After briefs were filed by the attorneys for Appellant and the Commission, the Court considered them and initially took the position that under the statute, 4 *Del. C.* § 541 (c), the record, as certified by the Commission, did not contain evidence on which Appellant could present his arguments based on the grounds of his appeal and that perhaps the Court should remand the record to the Commission for further testimony and decision.

The statute, 4 *Del. C.* § 541(c), of this State now provides:

"The Commission's decision shall be final and conclusive unless within 10 days after notice thereof a party to such hearing shall appeal to the Superior Court of the county in which the license would operate. *In every appeal the cause shall be decided by the court from the record, without the aid of a jury; and the court may affirm, reverse or modify the Commission's decision.* The Commission's findings of fact shall not be set aside unless the court determines that the record contains no substantial evidence that would reasonably support the findings. *If the court finds that additional evidence should be taken, the court may take the additional evidence or remand the cause to the Commission for completion of the record. If the court finds that the Commission has made an error of law, the court shall reverse or modify the Commission's decision and render an appropriate judgment.*" (Emphasis supplied.)

The question of whether the Court should "take the evidence or remand the cause to the Commission for completion of the record" was fully considered at length by the parties with the Court, and ultimately it was agreed by the parties that the Court should "take the evidence" rather than to "remand the cause to the Commission for completion of the record" and then "render" the "appropriate judgment".

Utlimately, the Court held two hearings; it also directed the Commission to analyze its records and prepare and submit reports showing certain information, not theretofore appearing in the record, which relates, at least indirectly, to the questions raised by Appellant in his grounds of appeal.

It was shown by evidence produced at the hearings held by the Court by personnel of the Commission (see particularly Commission's Ex. 1), and on it the Court finds:

1. The nearest establishment that is known to serve Negroes, living in the Town of Delaware City or in its environs, at a tap room, in the community and surrounding area of Delaware City, is Antonio's, located in New Castle, and it is almost ten (10) miles from Delaware City. The next closest place would be in Middletown, which is approximately fifteen (15) miles from Delaware City.

2. The proprietors of the various licensed establishments in Delaware City believe the grant of licenses to an establishment for Negroes would be proper and justifiable.

3. None of the licensed restaurants or tap rooms in the Town of Delaware City serve Negroes at bars or in dining rooms.

4. Negroes can make purchases of alcoholic liquors or beverages from licensed places in the Town of Delaware City, in a bottle or other container, for consumption "off the premises".

5. Delaware City has become a seaport town now and quite a few of the ships that berth there are manned by crewmen that are not white.

6. Check of licensed premises, located in the vicinity of the Town of Delaware City and in nearby areas, the mileage from Delaware City and what service could be had by Negroes reflects—

(a) Helen M. Keskemety, T/A Kelly's Tavern, located at Port Penn, Del., 4 miles from Delaware City— Service to Negroes refused other than for off-sale consumption.

(b) Augustine Beach Hotel, Inc., located 5 miles from Delaware City—Service to Negroes refused other than for off-sales consumption.

(c) William J. & Mary Prouse, T/A Dragon Runn Inn, located at St. Georges, Delaware, 5 miles from Delaware City—Service to Negroes refused other than for off-sales consumption.

(d) Aaron T. Argo, T/A Red Lion Inn, located at Bear, Delaware, 12 miles from Delaware City—Service to Negroes refused other than for off-sales consumption.

7. Records of the Commission, compiled at the Court's request, in evidence as Commission Ex. 2-A, show that all three licensees for sales of alcoholic liquors for consumption off the premises show a very substantial excess of sales in comparison with sales of other licensees elsewhere, particularly for on premises consumption.

8. The Court further finds that the premises for which Appellant seeks licenses was a licensed establishment from March, 1948, until June 30, 1958; that the proprietor of the establishment did not apply for a renewal of license after the latter date.

9. That from April, 1954, until his licenses expired on June 30, 1958, for failure of renewal, such proprietor held licenses for sales for both on-premises and off-premises consumption.

10. The premises were at that time licensed as a restaurant.

11. Apparently the only difference between an establishment licensed by the Commission for alcoholic beverage sales as a restaurant and a licensed establishment as a tap room, is that the restaurant establishment may admit minors (for food service), while a tap room may not; but a tap room licensee may also serve meals.

■ The Commission determined the "area" in which people live, particularly those of the Colored race, constituting the limits of demand for service, see Court's Findings 1-6, extends from New Castle to Middletown, figured North and South, and several miles to the West to Bear, Delaware; this area includes the 5th, 9th and 16th Election Districts of New Castle Hundred; the 1st, 2d and 3d Election Districts of Red Lion Hundred and the 1st and 2d Election Districts of St. Georges Hundred. The records[2] of the New Castle County Board of Elections show, for the relevant periods here, the number of Registered Voters (all over 21 years old) in this area as follows:

NEW CASTLE HUNDRED

| | | 1956 | 1958 | 1960 | 1962 |
|---|---|---|---|---|---|
| District | 5 | 719 | 827 | 1,036 | 989 |
| District | 9 | 550 | 620 | 981 | 1,064 |
| District | 16 | 276 | 293 | 327 | 297 |

RED LION HUNDRED

| District | 1 | 475 | 479 | 152 | 154 |
|---|---|---|---|---|---|
| District | 2 | 520 | 587 | 299 | 347 |
| District | 3 | 361 | 391 | 165 | 149 |

ST. GEORGE'S HUNDRED

| District | 1 | 329 | 373 | 398 | 424 |
|---|---|---|---|---|---|
| District | 2 | 194 | 208 | 220 | 247 |

The relevant records of the New Castle County Board of Assessment show, as to the areas involved:

NEW CASTLE HUNDRED

| | | 1958 | 1960 | 1962 |
|---|---|---|---|---|
| District | 5 | $5,201,500 | $5,588,600 | $5,907,000 |
| District | 9 | $6,157,900 | $8,591,800 | $9,527,200 |
| District | 16 | $1,824,800 | $1,854,900 | $3,698,900 |

RED LION HUNDRED

| | | 1958 | 1960 | 1962 |
|---|---|---|---|---|
| District | 1 | $11,456,200 | $11,472,700 | $11,464,400 |
| District | 2 | $12,293,000 | $12,441,900 | $14,643,900 |
| District | 3 | $ 962,300 | $ 979,100 | $ 979,500 |

ST. GEORGE'S HUNDRED

| | | 1958 | 1960 | 1962 |
|---|---|---|---|---|
| District | 1 | $2,956,200 | $3,049,200 | $3,191,100 |
| District | 2 | $1,971,100 | $2,019,500 | $2,061,300 |

[2]The facts of which Courts can take judicial notice are discussed in 31 C.J.S. Evidence §§ 6, 9, 33, 34, 36, 37 and 42. The matters of which

An analysis of the Annual Reports of the Department of Public Instruction, State of Delaware, shows that the area involved includes some of the fastest growing school districts in New Castle County. For instance—

The Gunning Bedford, Jr. School District contains about one-third of New Castle Election District Number 5, about five-sixths of the Red Lion Election District Number One, all of Red Lion Election District Number 2, all of Red Lion Election District Number 3, about one-third of St. Georges Election District Number 1, and one-third of St. Georges Election District Number 2. This school district has increased in enrollment from 705 in 1956 to 937 in 1962. It recently completed a new comprehensive high school, which should take care of their building needs for some time to come. It is forecast that this school district may reach 1200 or more by 1970.

The New Castle Special School District contains about one-third of the New Castle Election District Number 5, all of New Castle Election District Number 9, and all of New Castle Election District Number 16. Election District Number 9 contains the bulk of the school district's population which has expanded from 3,079 in 1956 to 4,-728 in 1962 as follows during the years:

| Year | Enrollment |
| --- | --- |
| 1956 | 3,079 |
| 1957 | 3,272 |
| 1958 | 3,408 |
| 1959 | 3,654 |
| 1960 | 4,039 |
| 1961 | 4,313 |
| 1962 | 4,728 |

the Court takes judicial knowledge here are all matters of public record or contained in reports made, published or authorized by statute. See

The New Castle Special School District has added one new junior high school building and one new elementary school building during this time. Present plans call for another senior high school, another junior high school, and one or two elementary schools. This district is expected to grow another 40 to 50 per cent by 1970. As has been stated, other election districts come within this special school district. It is not possible to refine the pertinent information down to the particular election districts involved.

The Newark Special School District contains about one-third of the New Castle Election District Number 5. This represents a relatively minor portion of the district, which is the most rapidly growing district among those mentioned in this opinion. Examination of the reports discloses Newark has mushroomed from 4,102 students in 1956 to 7,820 students in 1962. Its school building program has been moving along steadily to keep pace with mounting enrollments, starting in 1956 with six buildings, and expanding to eleven buildings. More buildings are in the construction stage. The Newark Special School District is the second largest in the state, and may expand to over 10,000 pupils by 1970. The same caveat is noted here as was made for the New Castle Special School District.

The Middletown No. 60 School District contains about one-sixth of the Red Lion Election District Number 1, about one-third of the St. Georges Election District Num-

---

*Brennan v. Black,* 34 Del.Ch. 380, 412, 104 A.2d 777, 794 (Sup.Ct.1954); *Abbott Supply Co. v. Shockley,* 11 Terry 261, 128 A.2d 794, aff'd 11 Terry 510, 516, 135 A.2d 607, 610 (Sup.Ct.1957).

The material which is set out is of some importance in light of what "factors" are to be considered in applying the concept of "public convenience and necessity" in the grant or refusal of license applications. See discussion, post, pages 16b et seq.

ber 1, and one-third of St. Georges Election District Number 2. This district has expanded from 908 in 1956 to 1,-031 by 1962. During this time additions have been made to the original buildings and further expansion is expected. It seems possible that this district may expand to about 1,200-1,300 pupils by 1970.

The Odessa School District contains about one-third of St. Georges Election District Number 1 and one-third fo St. Georges Election District Number 2. This district has maintained an enrollment of around 115-120 during the years 1956-1962, and present circumstances indicate that very little expansion is anticipated by 1970.

A study of Census Information—available to all interested persons—shows, as to the Hundreds of New Castle in which the "area" used by the Commission for its purposes, as mentioned above, the following:

| | 1950 Pop. | 1960 Pop. | Percentage Growth |
|---|---|---|---|
| New Castle Hundred | 21,824 | 40,293 | +85% |
| White Clay Creek Hundred | 9,057 | 20,040 | +121% |
| Red Lion Hundred | 3,053 | 3,401 | +11% |
| (includes Delaware City) | | | |
| St. Georges Hundred | 4,544 | 5,218 | +15% |

The growth of the incorporated town of Delaware City in the same period was 1,363 (1950) to 1,658 (1960) —an increase of 22%.

Population per square mile in 1958:
| New Castle Hundred | 955 persons |
|---|---|
| White Clay Creek Hundred | 862 persons |
| Red Lion Hundred | 182 persons |

The foregoing, taken altogether, seems significant, when one reviews the factors that should have had the Commission's consideration, quite apart from the specific questions presented—all of it bears, as will be shown hereafter, on the application of the statutory concept of "public convenience and necessity" sought to be utilized

and applied by the Commission, specifically at page 15, post, in its presentation of the next point considered by the Court.

The attorney for the Commission sought, at the hearings before the Court, to show by testimony of the Superintendent of the Governor Bacon Health Center, that the gate of this Center is located across the road from Appellant's premises, and that this Health Center was used as a place to care for alcoholics, so that the proximity of a licensed place on Appellant's premises to the unguarded gate of this Health Center would be undesirable. This witness testified (over Appellant's objection):

"Q Do you think that the location of a tap room outside the gate would be desirable, from the health standpoint, of the patients' health, who are confined there, either of their own volition or involuntarily?

"A Patients who are beginning treatment for alcoholism have a strong desire to drink, and this would certainly be a temptation to them if there was a tap room immediately outside the gate. It would not only be a temptation to them in that they could simply go across the street and get a drink, but if they were near the gate and saw signs up, it would tempt them. This would make it much harder to treat them, and certainly would be contrary to all treatments that we would be giving them at the hospital." (Tr.R., p. 63)

Appellant's attorney argues that the grant of power to the Court, by 4 *Del. C.* § 541(c), to take additional evidence, so as to complete a record does not mean a change of the record; that the supplementation of the record made possible under the statute is, says Appellant's attorney, for the purpose of enabling the Court to determine, in its reviewing function, whether or not there was

an exercise of sound legal discretion on the part of the Commission in considering Appellant's application. He points to language of this Court in the Diamond State points to language of this Court in the *Diamond State Liquors, Inc.* case, 6 Terry 412, at p. 419, 75 A.2d 248, at

"\* \* \* Whether there was an exercise of a sound legal discretion \* \* \* depends upon what the Commission did to learn of the facts in connection with [the] application and the existing conditions in the locality."
Attention is called to this Court's language in *Park Distributing Co. v. Commission*, 5 Terry 6, 22-23, 54 A.2d 551, 559 (1947):

"The Commission apparently relies on Finding 2 as a basis for its conclusion that there are now a sufficient number of importers in Delaware to serve all retail licensees. Whether retailers and the public are being adequately served, whether the business of existing importers is competitive, and whether the public is protected from unfair and unjustified price increases are high order inferences from (among other things) courses of conduct followed, business methods employed, and ultimately, multitudinous individual transactions undertaken in the liquor business during a period of time. *The significance and value attributable to statements of such inferences largely depends upon the facts upon which they are based, the extent to which the total available revelant facts have been investigated, and the apparent probability that the facts investigated are typical of all the relevant facts.* Here, the Commission's inferences in Finding 2 are based principally on the testimony of its chief inspector and of three representatives of licensed importers. Such testimony is for the most part in the form of opinions of the witnesses.

It does not appear that their opinions were founded on anything remotely resembling a survey of conditions existing in the business[3]. \* \* \*" (Emphasis supplied)

■ Such statements by this Court tend to point out and stress what the Commission must do to justify its decision and it may restrict the Commission when the case is here for review and an application is made to take additional evidence. It seems, at this point, that *what the Commission now wants to do with respect to issuance or rejection of an application, should have been done while the applications were under study and consideration by it.*

Appellant's attorney says the taking of additional evidence enables the Court only to complete the record so as to be in a position to appraise the validity or lack of validity of the reasons stated as grounds of Appellant's appeal in respect to the Commission's decision; that the power in the Court to take evidence cannot be utilized by the Commission as affording it a further opportunity to adduce other evidence in support of other reasons for its decision or for refusal of the license for reasons not set forth in the decision from which the appeal was taken. *Kam Ng v. Pilliod,* decided by Court of Appeals, 7th Cir., 1960, 279 F.2d 207, and found in 10 Pike and Fisher Administrative Law 2d 416, 419, is cited. There, in considering the effect to be given to an affidavit injected into the case after the administrative agency had conducted its hearing, the Court stated:

"\* \* \* These matters were not before the administrative agency in the proceedings had in this case.

---

[3]This statement is a judicial recognition that the Commission must obtain and consider all pertinent facts that bear on an applicant's right to a license. See discussion, post at p. 307 et seq.

"The limited judicial review of the discretionary administrative action does not contemplate a trial *de novo* of matters which were known but not raised while the matter was pending before the agency."
This reason is sound and has logical appeal, but I do not regard this is the case to rule squarely on Appellant's contention.

The Commission's attorney, in argument, conceded that Judge Carey in *Rogers v. Commission*, 8 Terry 275, at p. 278, 90 A.2d 668 at p. 669 (Super.Ct.1952) had ruled:

"* * * the hearing on the appeal is not a trial denovo. * * *"

Nonetheless, he continued to argue that the statute, 4 *Del. C.* § 541(c), grants this Court ample authority to take and consider additional testimony and he insists that the Court must in the exercise of judicial discretion, take and consider such additional testimony as will enable the Court to reach an equitable conclusion—to take it from both sides on any point—from the Commission as well as from Appellant. The power given to the Court, 4 *Del. C.* § 541 (c), says the Commission, to take additional testimony requires the Court to "leave no stone unturned in reaching a just and equitable decision based on all the evidence." I am not ready to accept such reasoning unqualifiedly, although much can be said in its favor in light of 4 *Del. C.* § 541(c).

The Commission points to page 48 of the record of testimony taken before the Court, where Mr. Conway, Chairman of the Commission, gave this testimony, in response to an inquiry by the Court:

"BY THE COURT:

"Q You did what you did based upon his application and the Inspector's report?

"A No. Tarumianz[4] asked me not to grant it, and * * *."

It is to be observed that it was the Commission's "right"—at least its perogative—to conduct or not to conduct a hearing on the applications for licenses submitted by Appellant; the Commission is empowered to make its Findings of Fact from its investigation. It had the opportunity to show in the record certified by it to the Court the reasons on which it based its denial of the application—and this it did—and for reasons best known to the Commission it did not choose to include any reference to Dr. Tarumianz's telephonic request to the Chairman of the Commission not to grant the licenses.

The Court, it may be said, does not approve of such methods in the making of a record by an administrative agency. In fact, the Court rules this was wholly improper. As a fundamental right, all parties to any proceeding, legal or administrative, have the right to be confronted by the witnesses who give testimony against them; the right to cross examine such a witness, and to adduce evidence to refute what they say. If a protest was to be raised to the granting of the licenses it should have followed the form prescribed by the statute, Title 4 *Del. C.* § 541(b) and if the Commission saw merit in the protest, a hearing should have been held on the applications and appellant given an opportunity of knowing the identity of those who would oppose his applications. It is highly questionable for any state agency to contact the Commission and interpose an objection to issuance of a license—certainly not without following the statutory procedures.

---

[4]Dr. Tarumianz was Superintendent of Governor Bacon Health Center at the time Appellant submitted his applications to the Commission for issuance of the licenses.

■ The Commission seemingly argues it might have based its denial of the applications on a factor such as is stated by Dr. Bush. This is why the Court must consider such basis of argument, i. e. if the relative location of the gate to the Governor Bacon Health Center to Appellant's premises could have been a valid reason for the Commission to deny the application, or if the proffered evidence had any relevancy to any legal basis for denial of the applications.

■ 4 *Del. C.* § 543 sets forth the statutory grounds for refusal of issuance of licenses by the Commission. It nowhere appears therein that the proximity of an institution like the Governor Bacon Health Center to a proposed licensed establishment is a ground for the Commission to refuse a license. In *Park Distributing Co. v. Commission*, supra, this Court said:

"* * * *The Commission is not empowered to reject an application* * * * *unless the Commission has reasonable ground to believe that a statutory ground of refusal exists.* * * *"* (Emphasis supplied)

*Lord v. Commission*, 2 Terry 154, 161-163, 17 A.2d 230-233 (Super.Ct.1940) is to the same effect; see also *Moore v. Commission*, 6 Terry 569, 571, 77 A.2d 74,75 (Super.Ct. 1950), and *Lyons v. Commission*, 5 Terry 304, 312, 58 A.2d 889, 892 (Super.Ct. 1948).

■■ The Commission points to 4 *Del. C.* § 543 (b) (9) as a ground on which the Commission may refuse a license, i.e., that—

"(9) There is any other reason which in the opinion of the Commission *based on public convenience or necessity warrants its refusal to grant such license."* (Emphasis supplied)

The concept of "public convenience or necessity" has been considered and its meaning stated and fairly well established in many of our cases. See *Lord v. Commission,* supra; *Park Distributing Co. v. Commission,* 5 Terry 6, 24—26, 54 A.2d 551, 560 (Super.Ct.1947); *Lyons v. Commission,* 5 Terry 304, 58 A.2d 889, 893 (Super.Ct. 1948); *Diamond State Liquors, Inc. v. Commission,* 6 Terry 412, 419, 75 A.2d 248, 253 (Super.Ct.1950); *Moore v. Commission,* 6 Terry 569, 572, 77 A.2d 74, 76 (Super.Ct.1950) and *Wilmington Country Club v. Commission,* 8 Terry 352, 364, 91 A.2d 250, 256 (Super.Ct.1952). In the Lyons case this Court emphasized that the Commission could not use the concept of "public convenience or necessity" to justify denial of an application, based on a reason beyond its power. In *Wilmington Country Club v. Commission, Id.,* it was noted—

"The words of 'public interest or convenience' * * * have reference only to the ability of the public to have available a convenient place to make a legal purchase of liquor. * * *"

The meaning to be given to the concept of "public convenience or necessity", as well as the concept expressed as "convenience and advantage", has been discussed in several law review articles. Seemingly the meaning varies as the statute, as a whole, dictates and requires. This is brought out from law review articles such as "Certificates of Convenience and Necessity", 28 Mich.Law Rev. 107 and 276 (1930); "Public Convenience and Advantage in Applications for New Banks and Branches," by Edwin Stokes, now of the Delaware Bar, 74 Banking Law Journal, 921 (1957); and "Convenience and Advantage in Small Loan Licensing", 2 Boston College Industrial and Commercial Law Review 93, also by Mr. Stokes (1960). Much of what is stated in these articles illustrate the problems arising in determining how the concept is to be applied under our

Liquor Control Statute, although what has been decided in the above cited cases from our Courts as to the meaning of the concept must govern.

Mr. Stokes in his article appearing in 74 Banking Law Journal at page 928, has noted the difficulty in the exact definition to be given to these concepts, stating:

"* * *. The inability to define the clause is not a serious obstacle to the application of the standard as long as one bears in mind its objectives and thinks in terms of [the] need * * * [stated in the statute and what the legislature had in mind in adoption of the statute]."

There is a brief discussion in 28 Michigan Law Rev. at p. 111 of "the constitutionality of statutes requiring certificates of convenience and necessity" and it is stated—"In general [their constitutionality] has been upheld".

No cases have been found which considered that the concept is vague and lacking in standards as to be unconstitutional. Compare *Winters v. New York*, 333 U.S. 507, 509, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948); *Roth v. U. S.*, 354 U.S. 476, 488 77 S.Ct. 1304, 1311, I L.Ed.2d 1498 (1957); and see *Kelleher v. Minshull*, 11 Wash.2d 380, 119 P.2d 302, 309, 310 (1941) and *Schaake v. Dolley*, 85 Kan. 598, 118 P. 80, 37 L.R.A.,N.S., 877 (1911).

In *Kelleher v. Minshull*, supra, the Washington Supreme Court said (119 P.2d at p. 310) in part:

"Statutory provisions using the formulae 'public convenience and advantage,' 'public necessity' and similar expressions have been sustained in a legion of cases. * * *

* * * * * *

"We conclude this portion of our discussion by saying that, in our opinion, the provisions above referred to are sufficiently definite and certain to enable the supervisor to administer the act as intended by the legislature, * * *."

The same Court had said previously (11 Wash.2d p. 309, 119 P.2d p. 309) in the same opinion:

"It is not always necessary that statutes \* \* \* prescribe a specific rule of action. This is particularly true in those situations where it is difficult or impracticable to declare a definite, comprehensive rule, or where the discretion to be exercised by an administrative officer relates to a regulation imposed for the protection of public morals, health, safety and general welfare. \* \* \*"

See *Darling Apartment Co. v. Springer,* 25 Del.Ch. 98, 15 A.2d 670 (Ct.Ch.1940) aff'd. 25 Del.Ch. 420, 22 A.2d 397, 137 A.L.R. 803 (Sup.Ct.1941), and *Hoff v. State,* 9 W.W. Harr. 134, 141, 197 A. 75, 79 (1938).

Mr. Stokes has made a notable contribution in the field of Administrative Law in assembling together and articulating—74 Banking Law Journal, 928—the many factors[5] to be considered in the grant or refusal of licenses when these concepts play a part in the consideration of applications for licenses. He points out "what facts are to be delied upon" in showing the existence or non existence of such factors by the administrative agency. Mr. Stokes states (p. 929) that the meaning to be given to the concept is "to further the prime public interest"—as it appears from the objectives[6] expressed in the statute. At page 932 he emphasizes that the concept is to be applied as the needs of the "area" or the "community dictates". Then he states:

---

[5]Some of these are considered, supra, page 301.

[6]See language of former Judge Rodney in *Lord v. Commission,* 2 Terry at 165, 17 A.2d 235—"\* \* \* the words 'public convenience or necessity' clearly have reference to the ability of the public to have available a convenient place to make a legal purchase of liquor \* \* \*." See also *Wilmington Country Club v. Commission,* supra, 306, where former Chief Justice Layton used similar language.

"* * *. The presence or absence of the words relating to 'community' [or area] will make little difference. With the exception of the rare instance of a statutory definition to the contrary, the word 'community' does not mean 'municipality', but rather refers to a geographical segment which for [the statute's] purposes is regarded as a unit. It may be a part of a municipality, a municipality or a municipality and the surrounding area normally attracted to its trade center.

"The area to be served must be supported in reason. Usually, it is not sufficient to draw a circle with a specified radius on a map with the proposed [place of business] as the center and claim that as the area.[7]. An on-the-spot survey together with a consideration of the other matters hereafter mentioned will suggest the physical limitations of the area. Natural barriers such as rivers and mountains and man-made ones like railroad lines and highways often made effective boundary lines. Traditional trade areas or communities are often evidenced by the nomenclature of districts, merchants' associations, theaters, retail establishments and social groups.

"Frequently, the trade areas of nearby centers [may] overlap. Also, the area may include [surrounding] segments * * *. For example, the center in which it is proposed to locate the new facility may be close to a state boundary line and part of the area to be served may lie in a sister state. * * *.

\* \* \* \* \* \*

"It will be necessary to indicate the actual distances of such services from the applicant's location, to analyze their

---

[7]The Commission itself has set up and defined the *area,* supra at pp. 300, 301, served by the persons affected by grant or refusal of appellant's application.

business position with respect to gain or loss and with respect to business policies. * * *.

* * * * * *

"The number of people in the area to be served can be determined accurately. Census data can be supplemented by current estimates obtained from sources such as municipal officials, local newspapers, trade associations and business publications. If the area to be served is a part of a city or if it includes a segment of an adjoining municipality, the number of residents in the segment can be determined by obtaining maps of the municipalities showing voting wards and districts. Records of the number of registered voters in each ward and district are available. It may be assumed that the ratio of registered voters to population is the same for the segment as for the municipality in which it is located. The application of that ratio to the registered voters in the segment will give the number of people living there. It is to be noted that if such maps are used and the number of registered voters are indicated for each ward and district, it will be possible to show where most of the people in the area live.

"Comparative data is often helpful. Comparisons of percentage of population increase or decrease in the municipality * * * with county and state percentage changes for the same periods are of value in those instances where the original population base of the municipality is large enough to prevent small changes from making large percentage differences.

"The present figures will always be colored by past and future prospects. Increase or decrease can be established by comparing reported census figures and current estimates. The Number and value of building permits and data from the post office relating to receipts and drops supplement population figures. Estimates of future growth

or decrease sometimes are available in the form of economic studies made by local, county or state agencies and in some instances newspapers have had surveys made by market analysts. The planning of school authorities is necessarily based on estimates of future population. Frequently, they have had studies made. Land for development and zoning ordinances and their recent or proposed changes can be indicative of a future trend. An established real estate agent will have information on what plans have been made for future development before they are reflected in building permit records.

"Aside from the numbers, some information on the people themselves is required. For example, income classification is important. Also factors as whether a substantial portion are homeowners, commuters, farmers, seasonal workers [see *Lord v. Commission,* 2 Terry at pgs. 163-164, 17 A.2d at pgs. 233-234, where this factor was considered]."

These are but some of the factors that Mr. Stokes suggests must be considered in determining what and how the "public convenience and necessity" is to be served. Other factors are pointed out—locations of trade centers, shopping centers, a study of retail sales statistics, the "economic strength" of the community or area, established and contemplated housing developments.

The author further notes (p. 936):

"* * *. Future population estimates, planned building, development of parking areas, enlarging existing retail, wholesale and industrial establishments and the like help in determining the future trend.

"The dollar volume of retail, wholesale and service establishments can be supplemented by a description of the number of such establishments, the kind of business done

and the number of people employed. Pedestrian and vehicle traffic counts are informative. A listing of facilities such as newspapers, hotels, places of amusement, hospitals, governmental offices, field offices of utilities, insurance companies and the like, as well as a description of the more prominent businesses, gives the breath of life to statistical data.

"It is comparatively easy to obtain data on industry in the area. Normally, such concerns will disclose the approximate number of employees and will advise whether their business is seasonal. Such data is often collected by the chamber of commerce. In some states industrial directories are published which will give the information needed. A real estate agent will be able to locate all the industrial plants in the area and will have considerable information on them.

"The future potential is measured by the demand for the products, the availability of power, water, land, transportation and labor. Directly bearing on this is the history of the industries, involving questions such as whether they are new or well established and on how broad a gauge they have been operating.

\*　　\*　　\*　　\*　　\*　　\*

"If agricultural, cattle or dairy products are prominent in the economy, it will be necessary to develop data with respect to the size of the various operations, volume of sales, income, number of people engaged in the industry, amount of land dedicated to the particular pursuit and comparisons with earlier years. Prospects for the future are important."

 Nowhere, however, does the author point to a negative factor, such as the Commission[8] would emphasize, i.e., the location of the gate to the Governor Bacon Health Center, in attempting to measure the "public convenience and necessity", particularly in light of the specific grounds set out in the statute as grounds for refusal of a license.

It is difficult, if not impossible, in view of past decisions of our Courts defining "public convenience or necessity" to comprehend why the Commission would point to this concept as a reason for seeking to deny the applications— to say that the proximity of the gate of the Governor Bacon Health Center to applicant's premises is to be considered in any wise in its consideration of the applications in light of applicability of the concept as defined by our Courts. If the Board of Trustees controlling the Health Center had wanted to protest, as provided by the statute book, in the period from 1948 to 1958 (see Findings No. 8—10, supra, p. 301), it could and should have done so. It is doubtful that these Trustees could have maintained a protest after the lapse of so long a period; it could be argued they were estopped. That is a question I don't have to determine.

 Returning to a consideration of the issue before the Court, if the now stated statutory grounds for refusal of applications are not complete and lacking in realism, resort can and should be had—perhaps by these Trustees—to the General Assembly to enlarge their number, but not in the manner here adopted, since neither the Commission nor this Court has power to add a new ground for refusal of a license if applicant meets other require-

---

[8] I am sure all would agree that political influences or having a friend on the Commission should not be a factor, see Application of Penny Hill Corp., 1 Storey 574, 150 A.2d 184, Rev. 2 Storey 203, 154 A.2d 888 (Sup. Ct.1959).

ments. Again I note that in the Lyons case, supra p. 15, this Court ruled that the Commission cannot use this concept of "public convenience and necessity" to justify denial of an application, if there are no statutory reasons otherwise supporting the Commission's decision in refusing the application. The Commission must look to the statute for the policies to be followed in granting or refusing applications for licenses, *Lord v. Commission,* 2 Terry 154, 17 A.2d 230 (1941, Super.Ct.).

In *Moore v. Commission,* 6 Terry 569, 571, 77 A.2d 74, (Super.Ct.1950) this Court said:

"* * * In order for a license to be refused on one of the statutory grounds, the Commission must have a reasonable basis for believing that the statutory ground of refusal exists."

In the Diamond State Liquors, Inc. case, 6 Terry at page 420, 75 A.2d at page 253 the Court observed:

"* * * it must be remembered that the * * * Commission is an administrative body and has no powers other than those conferred upon it by the statute by which it was created. * * *"

See also *Wilmington Country Club v. Commission,* supra, and *Wilmington Vitamin Co. v. Tique,* 5 Storey 20, 183 A.2d 731, pages 739-742 (Super.Ct.1962). The Delaware Courts have always looked at the Legislative Enactments, setting up an administrative agency and granting it powers to ascertain the extent of the agency's powers, *Board of School Trustees v. O'Brien,* Del., 190 A.2d 23; *Shockley v. Board of Education,* 2 Storey 237, 245, 155 A.2d 323, 329 (Sup.Ct. 1959), Reargument den., 2 Storey 277, 156 A.2d 214 (Sup. Ct.1959); *Homan v. Lynch,* 1 Storey 433, 147 A.2d 650, 653 (Sup.Ct.1959); *Application of Hickman Co.,* 10 Terry 13,

17, 21, 26, 108 A.2d 667, 669, 671, 674 (Sup.Ct.1954) ; *St. Stanislaus Kostka Church v. Mayor and Council,* 9 Terry 411, 105 A.2d 596 (Sup.Ct.1954), *Aff'd Carey v. Bryan & Rollins,* 10 Terry 387, 117 A.2d 240; *Searles v. Darling,* 7 Terry 263, 274, 83 A.2d 96, 101 (Sup.Ct. 1951) ; *Auditorium, Inc. v. Mayor and Council,* 8 Terry 373, 382, 383, 91 A.2d 528, 533 (Sup.Ct.1951) ; *American Car & Foundry Co. v. Schneider,* 3 W.W.Harr. 379, 138 A. 602 (Super.Ct. 1927) ; *Collins & Ryan v. Hudson,* 6 Terry 438, 443, 444, 447, 75 A.2d 261, 264, 265 (Super.Ct.1950) ; *Application of Julian,* 3 Storey 175, 182, 167 A.2d 21, 25 (Super.Ct. 1960) ; *Fiorucci v. C. F. Braun & Co.,* 4 Storey 79, 173 A.2d 635 (Super.Ct.1961) ; *Pencader Corp. v. Wilson,* et al., *constituting Board of Adjustment,* New Castle County, Del. C.A. 1130, 1962. Opinion by Judge Storey, filed March 20, 1963; *General Motors Corp. v. Socorso,* 9 Terry 418, 421, 426, 105 A.2d 641, 643, 645 (Super.Ct.1954). The Commission could not then have refused the applications on the basis of the proximity of Appellant's premises to Governor Bacon Health Center, even had it considered it and its record contained a finding to such effect, hence Appellant's motion to strike Dr. Bush's testimony as irrelevant must be and it is sustained.

The commission's attorney next argues because of 4 *Del. C.* § 541(c) this Court is without power to and should not set aside the Commission's decision. *DeMarie v. Commission,* 1 Storey 206, 143 A.2d 119 (Sup.Ct.1958) is cited as determinative. In DeMarie, the Supreme Court only said (1 Storey at p. 213, 143 A.2d 122) :

"* * * Its [the Commission's] decision, *if based upon proper evidence* [substantial evidence] * * * *and made in the exercise of sound discretion,* will not be disturbed. * * *." (Emphasis supplied)

This Court found in *Moore v. Commission,* supra, under the same, or at least comparable circumstances, namely, the absolute unavailability to all the citizenry of the "convenience" to be served, hence the statutory ground for refusal of a license did not exist and it therefore ruled a license should be granted. The Court said in Moore, 6 Terry at p. 572, 77 A.2d at p. 76, that—

"the refusal to grant the license applied for was not justified by any of the statutory grounds for refusal * * *." In Moore, this Court noted: (Id.)

"* * * generally speaking, the patronage of Negroes is not sought by restaurants, catering primarily to the white population. *Irrespective of what the Negro citizen's legal right may be to compel service in establishments catering primarily to the white population, the Negro population of any community is equally entitled under the law to convenience in purchasing and consuming alcoholic beverages. This convenience certainly includes the opportunity of consuming alcoholic liquors with meals * * *.* The proximity of licensed establishments catering primarily to white patrons does not necessarily satisfy the interest and convenience of the Negro population of the community." (Emphasis supplied)

The Commission must justify its decision on the record and its findings, and also show its decision is valid in accordance with the law. 42 Am.Jur.—Public Adm.Law—§§ 26, 55,[9] 68, 116, 155 and 156 and 73 C.J.S. Public Adm.Bodies and Procedure—§§ 48, 59, 60, 71, and 141. In 42 Am.Jur.—Public Adm.Law—at pp. 511-512, the following legal principles are stated:

"Administrative determinations made without jurisdiction are void. Irrespective of whether the question of

---

[9] At pages 361-362.

conclusiveness or finality of an administrative decision arises in a review proceeding * * * or * * * whether the question arises as one affecting the power of the administrative agency which has rendered such decision,

* * * *the general rule seems to be that lack of jurisdiction in an administrative agency renders its decision absolutely void and deprives it of any conclusive effects whatsoever. This is true whether jurisdiction over the person or jurisdiction over the subject matter is lacking. * * *.* (Emphasis supplied)

"That an administrative determination suffers a jurisdictional defect is manifest where the statute conferring powers on the administrative authorities is unconstitutional. * * *."

To this rule the Court adds this—if the agency applies the statute granting it authority to act in an unconstitutional manner or in violation of constitutional rights—its decision cannot be upheld. Compare *Ins. Dept. v. Schoonover,* 225 Ind. 187, 72 N.E.2d 747, 749, 750.

 And in 73 C.J.S. Public Administrative Bodies and Procedure—other applicable legal principles are to be found, which principles are most relevant here. Thus, in § 59, at page 383,

*"Administrative officers and agencies must pursue their authority and act within the scope of their powers.* Their exercise of authority·must be authorized by, and be in accordance with the requirements of, controlling provisions and principles of law. *Such* officers and *agencies are bound by the terms of the statutes* or regulations *granting them their powers, and are required to act in accordance therewith and to keep within the limits of the powers and authority granted them. They are without power to* act contrary to the provisions of the law or the clear leg-

islative intendment, or to *exceed the authority conferred on them by statute.* They have no power to authorize or acquiesce in the doing of a thing unauthorized \* \* \*." (Emphasis supplied)

██ ██ And in the same work in § 60, at page 385, it is stated:

"\* \* \* No particular form of proceeding is required to constitute due process in administrative proceedings; all that is required is that the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play. *Its requirements include the revelation of the evidence*[10] *on which a disputed order is based, an opportunity to explore*[11] *that evidence,* and a conclusion based on reason; and *its essential requirements are met where the administrative body is required to determine the existence or nonexistence of the necessary facts before any decision is made.*

"Whether or not a person has been deprived of due process of law by the action of an administrative agency or body depends on whether it acted contrary to the statutes and rules and with arbitrary and unreasonable discrimination. *Denial of due process occurs where the exercise of power by an administrative officer or body is arbitrary or capricious,* or where a decision of a board or commission is based on mere guesswork as to an essential element. \* \* \*" (Emphasis supplied)

The conclusion necessarily follows that this Court can and must determine if the Commission acted according to law; that its decision was based upon proper and "substantial" evidence, and "made in the exercise of sound discretion, \* \* \*". Only if all these elements are shown

---

[10]See discussion, supra, p. 305.
[11]See discussion, post, page 318, et seq.

to appear from the record is this Court bound by the Commission's action, the ruling and the decision of the Commission.

Coming now to a consideration of the specific questions presented by Appellant as grounds of his appeal, supra, p. 299 as appears from all the facts elicited and the Court's findings, they can be stated as definitely challenging the legality of the Commission's decision in denying the applications as not based on substantial evidence, as showing an abuse of discretion on the part of the Commission and a denial of the equal protection of the law—obviously meaning, as appears from the testimony taken by the Court, that Negroes in the Delaware City community cannot get equal treatment at the hands of the Commission's licensees in the sales of alcoholic liquors by drinks at tap rooms and restaurants. These are very serious questions—which must first be considered.

Before proceeding with any discussion it must again, supra p. 299, be made crystal clear that the Appellant has not and does not contend the Commission denied his applications solely because he is a Negro; Appellant, through his applications, seems, however, to be speaking for and in behalf of all the Negroes in the Delaware City community—in their desires to buy alcoholic liquors in the same manner as accorded to White citizens.

Appellant's real contention, first of all, is that the Commission's failure to conduct a proper investigation[12] and to compile a proper and adequate record precluded the presentation and consideration by it of evidence tending to show that Negro citizens of the community were deprived of equal protection of the law, and that this inade-

---

[12]See page 307, et seq., supra, as to what are the factors an administrative agency should have before it in considering applications for licenses.

quate record prevented the Commission from properly exercising a sound discretion on Appellant's application and determining if "there are already sufficient licensed premises in the locality" and if Negro citizens are treated the same by the Commission's licensees; BUT these contentions can only be reached by the answer to a further fundamental question, i.e.—Can this Appellant raise all of such questions?

This point gave the Court grave concern and caused it to pause long. There was never doubt in the Court's mind, after the hearings, but that the Negroes in the community of Delaware City were being discriminated against by the Commission's licensees and thus unjustly and illegally deprived of equal protection of the laws, by such policies as apparently were permitted by the Commission's "inaction" in not doing something about its licensees' refusal or failure to serve Negro citizens of the community on the same basis accorded White citizens in the same community. What could be done in their behalf?

The Court originally was of opinion that the Negroes so discriminated against were the only persons who could act to seek to assert protection of such rights and that any such action could not include a person making an application for an additional licensed establishment under the statute; that the Court was limited in its review of the Commission's decision, but after full and careful consideration of *Pierce v. Society,* et al., (U.S.Sup.Ct.1925) 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070, it clearly appears that this Appellant may assert the constitutional rights of other Negroes in the same community, as are affected by the discriminatory practices of the Commission's licensees, and such as the policy of administration of the act by the Commission seemingly permits. See also *Buchanan v. Warley,* 245 U.S. 60, 72, 38 S.Ct. 1617, 62 L.Ed. 149 (U.S.Sup.Ct.1917).

The Supreme Court points out in Pierce, supra, that the State of Oregon had enacted a statute requiring all children of school age to attend public schools. Corporate organizations which operated private, secular schools brought an action against the Governor of the State to restrain enforcement of the law. In substance they asserted not only their own constitutional rights but also those of parents and guardians of children affected by the statute. The United States Supreme Court affirmed the alleged unconstitutionality of the statute on the ground that the act unreasonably interfered with the liberty of parents and guardians to direct the upbringing and education of children under their control. The point of the case, for our purposes was this—that the Supreme Court permitted the constitutional rights of the parents and guardians to be asserted by and through the educational corporations. The Buchanan case is even more pertinent since a White man, affected by the application of an alleged unconstitutional ordinance of the City of Louisville, directed at the ownership of property by Negroes, was permitted to attack the constitutionality of the ordinance, even where it appeared the Negro was the person whose rights were directly involved and thereby necessarily impaired. See also *Parker, et al. v. University of Delaware*, 31 Del.Ch. 381, 385-386, 75 A.2d 225, 227-228 (Ct.Ch. 1950) where the present Chancellor discussed who could present asserted constitutional rights and any invasion thereof by a public agency and *Banks v. Housing Authority*, 120 Cal.App.2d 1, 260 P.2d 668, at p. 681, where the California Court recognized the right of one or more Negroes to maintain an action on behalf of others to equal protection of the law were being denied by decision and policy of a State Administrative Agency. Certiorari was denied 347 U.S. 974, 74 S.Ct. 784, 98 L.Ed. 1114 (1953).

Hence, I hold the several points asserted by Appellant, relating to the practices of the present licensees, may be asserted by Appellant—in behalf of the Negro citizens of the Delaware City area—and that I am not limited to only deciding if other and further licenses must be granted. I specifically rule that I can give the Negro citizens of the Delaware City area the same right to select the places where they may buy alcoholic spirits, as are now employed by the White citizens of the area.

A further preliminary question suggested by Appellant's grounds of appeal, supra, p. 299, in light of the Commission's reasons for decision, supra p. 298, and the ultimate concession made by the Commission by its Exhibit 1, set out at page 300, et seq. as part of the Court's findings, after the taking of further testimony in accordance with the statute and the agreement of the parties, is the effect the Court should give thereto, which, among other things, shows the continuing "inaction" of the Commission—even after getting knowledge of the policies and practices of its licensees in the Delaware City area. ¶It is preliminary but necessary to set out, the Court believes, the background of the real question to be decided—to what extent may the Commission permit—through "inaction"— its White Licensees to discriminate as between those they would serve. Mr. Justice Wolcott of our Supreme Court, when sitting in this Court, had the question before him in Moore, supra, but left it unanswered, supra, pp. 310, 311. Some discussion of this unanswered question will afford the proper background for giving a further understanding to the conclusion ultimately reached by the Court.

Going back to a consideration of the unanswered question that appeared in Moore, supra, and the Court deems it necessary to note the testimony of Mr. Conway,

Chairman of the Commission, at the hearing before the Court, pages 41 through 48, particularly at 47 and 48, where the following appears:

Q At any time subsequent to Mr. Ryan's investiga- tion, did the Commission take any action to modify the policy being employed by those licensees in Delaware City, that is, the policy of racial discrimination?

"A If you can point out to me, under the law, where we have any right to do that, we shall do it."

The Commission seemed to have the view that be- cause of the Delaware Inn Keepers Law, 24 *Del. C.* § 1501,[13] reading:

---

[13]Some study of the origin of this statute and the background against which it was enacted will aid in demonstrating why the law cannot be applied as presently viewed, at least from the Commission's place in the application and administration of the State Liquor Control Law, see Title 4 *Delaware Code* 1953.

William P. Frank, eminent columnist of the News Journal Papers in Wilmington, graciously called my attention to the Duke of Yorke's Laws, as published in the Charter to William Penn and Laws of the Province of Pennsylvania—passed between 1682 and 1700 and containing the Duke of Yorke's laws in force from 1676 to 1682, for which I am grateful.

This book was published in 1879 by direction of An Act of the General Assembly of the Commonwealth of Pennsylvania, enacted in 1878. These show that Inn Keepers have from the beginning of Colonial Days been subjected to regulation by the government. The extent of the regulation will be found at pages 30, 104, 173, 195, 311 and 351.

For instance at page 195 will be found a law passed in 1700, which provided:

"And it is further Enacted, that no person within this Province or territories, shall presume to keep any Ordinary or Drinking house without License first had and obtained of the Governour.

"And to the end that all travellers & such as are not House Keepers may be reasonably accomodated in places where Ordinaries now are, or shall be hereafter kept, no such keeper of an ordinary shall demand above seven pence half penny per meal by the head. Which meal shall consist of beef, pork, or such like produce of the country, with small beer; and of a footman hee shall not demand above two pence a night for his bed, and of a Horseman nothing. Hee paying Six pence a night for his horses hay or grass.

"And in case any person shall keep an ordinary or drinking house without a License, such person shall forfeit Five pounds.

"No keeper of an inn, tavern, hotel, or restaurant, or other place of public entertainment or refreshment of travelers, guests, or customers shall be obliged, by law, to furnish entertainment or refreshment to persons whose reception or entertainment by him would be offensive to the major part of his customers, and would injure his business.

---

Note 13 Continued—

"And in case any such keeper of an ordinary shall presume to ask more than is herein exprest, shall forfeit five Shillings for every such offence.

"And in case any such keeper of an Ordinary or master or mistress of such drinking house, shall keep a disorderly house, It shall and may be Lawful for the County Sessions where hee or shee lives, upon sufficient Testimony or Evidence thereof, to suppress the same."

In Volume 1 of the Delaware Laws, at pages 192-196 may be found a like if not the same statute, entitled "An Act for regulating inn-holders, tavern-keepers, and other public house-keepers within this government, and impowering the Justices [of the Court of Quarter Sessions] to settle the rates of liquors." Other legislation of like import appears at page 246, Volume 1, Laws of Delaware, and provides that innkeepers could not trust mariners "above the sum of Ten Shillings", and if they did they could not "stop or hinder such sailor or mariner from proceeding the intended voyage for which he shall have then be shipped". Sheriffs, undersheriffs or jailers could not keep tavern, Vol. 1, Delaware Laws, page 207. Justices of the Peace could not hold court in "any public inn, [or] tavern, or * * * attend any such inn, [or] public tavern * * * for the purpose stated * * *." 1 Del.Laws, p. 1052. Innkeepers and persons maintaining taverns were prohibited from promoting horse races and cock fighting. 3 Del.Laws, p. 230.

Under the general doctrine as stated in *Flanagin v. Daws*, 2 Houst. 476 (Ct. of E & A, 1862); *Fox v. Wharton*, 5 Del. Ch. 200, 220 et seq. (Ct.Ch.1878); *Woods v. Spoturno*, 7 W.W.Harr. 295, 317-318, 183 A. 319, 328 (Super.Ct.1936) reversed on other grounds 8 W.W.Harr. 378, 192 A. 689 (Sup.Ct.1937); *Glanding v. Industrial Trust Co.*, 28 Del.Ch. 499, 503-509, and dissent at p. 514, et seq., 45 A. 2d 553, 555-558, dissent at p. 560 (Sup.Ct.1946) and *Delaware Optometric Corp. et al. v. Sherwood et al.*, 36 Del.Ch. 223, 229, 128 A.2d 812, 816, (Sup.Ct.1957), it would seem these colonial laws were carried into and became a part of our law after 1776 and continued to be effective until repealed. It may be argued that there was at least implied repeal with the enactment of the Inn Keepers' Law. Innkeepers have, since Colonial times, been a public licensed business and can be compared to what was said in Burton, post.

Enactment of what is now 24 Del.Ch. § 1501, followed this series of events. In 1865, immediately following the Civil War, the states adopted the Thirteenth Amendment to the Constitution of the United States, whereby slavery was prohibited. When it was subsequently realized that

"As used in this section, 'customers' includes all who have occasion for entertainment or refreshment."

the Commission entertained doubt as to whether it could impose conditions in the issuance of licenses or adopt and follow a policy requiring all licensees to extend equal service to all, regardless of race or color—or if it could interfere with the now known policies of some of its licensees

---

Note 13 Continued—

the Thirteenth Amendment afforded exslaves no protection whatever against discriminatory state legislation, the Fourteenth Amendment was submitted to the states and adopted in 1868. Among other things it specifically provided:

"No State shall * * * deny to any person within its jurisdiction the equal protection of the laws."

The Fourteenth Amendment stopped legislative discrimination; but could not stop executive and judicial discrimination. The South, humiliated by defeat and seething under reconstruction, struck back with the Ku Klux Klan against the only available target—the negro. Before long, negroes found that while the law gave them equal rights, neither the law enforcement officials nor the courts gave them equal protection. To afford negroes, and indeed all citizens, a federal right in federal courts, where, because of prejudice or otherwise, their rights under the Fourteenth Amendment were being denied them, the Congress, on March 1, 1875, enacted a Civil Rights Bill. *Harrison v. Murphy* (U.S.Dist.Ct., Del.1962), 205 F. Supp. 449.

Presumably because the Civil Rights Bill was directed against all persons who practiced discrimination "* * * under color of any statute, ordinance, regulation, custom, or usage, of any State * * *" 42 U.S.C.A. § 1983, the Delaware legislature on March 25, 1875, just twenty-five days later, enacted 15 Del. Laws, Ch. 194, which appears in our present code as 24 *Del. C.* § 1501. It seems reasonable to conclude that the intent of the General Assembly was to assure the keepers of restaurants, etc. that, notwithstanding the broad, seemingly all-inclusive language of the then effective Civil Rights Bill, they were given the right to choose whom they would serve.

At a later point I discuss the Civil Rights Statute and the decision of the Supreme Court of the United States in the Civil Rights Cases (1883), 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835. It is sufficient here to observe that notwithstanding what might have been the common law in England, regarding the business of InnKeepers, in Delaware, since Colonial times, such business has been accepted to be public in nature, and have been licensed and regulated, thus evidencing a resemblance to the factual bases found in the several cases decided by the Supreme Court of the United States involving the application of the "equal protection clause of the" 14th Amendment.

to serve whom they would based on a licensee's personal predilections. I rule this is error.

It is clear this was not considered by the Commission in the consideration of Appellant's application, either in the investigative stage or in determining the applications, and this was an error of law.

The Moore case has been considered but *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), discussed in footnote 20 on page 335, et seq., post, is also apposite and its place in the law must be examined.

The majority said in that case, 365 U.S. at p. 717, 81 S.Ct. at p. 858:

"* * * the exclusion of appellant [a negro, from a restaurant conducted in a municipal facility,] under the circumstances shown to be present here was discriminatory state action in violation of the Equal Protection Clause of the Fourteenth Amendment."

Hence, the question left unanswered in Moore seems to have been passed on in Burton and in substance ruled to be "discriminatory state action [against Negroes] in violation of the Equal Protection Clause of the Fourteenth Amendment". The United States Supreme Court took the occasion to point out, 365 U.S. at 720, 81 S.Ct. 859, 6 L.Ed.2d 45, that actions of private persons in excluding Negroes from their service, if public powers were involved "would not" serve to insulate the public authority from the force and effect of the Fourteenth Amendment.

It must be further noted that the majority opinion, by Mr. Justice Clarke, observed in Burton, 365 U.S. at p. 725, 81 Sup.Ct. at 861, 6 L.Ed.2d 45:

"* * *. * * * *no State may effectively abdicate its responsibilities [under the Constitution] by either ig-*

noring them or by merely failing to discharge them whatever the motive may be. It is of no consolation to an individual denied the equal protection of the laws that it was done in good faith. Certainly the conclusions drawn in similar cases by the various Courts of Appeals do not depend upon such a distinction. *By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment."*

It is interesting to consider that in the concurring opinion of Mr. Justice Stewart, 365 U.S. at 726, 81 S.Ct. 862, and the dissents of Mr. Justice Harlan and of Mr. Justice Frankfurter, 365 U.S. at 730, 81 S.Ct. at 862, each of them said the so-called Delaware Inn Keepers Law, 24 *Del. C.* § 1501, was "clearly violative of the Fourteenth Amendment".

██ ██ With utmost respect and full and due deference for what the Supreme Court of this State said in *Burton,* Del.Ch. 157 A.2d 894, 902 (1960), I must rule under the controlling decisions of the United States Supreme Court, see Opinion of Justices of Supreme Court of Delaware filed May 6, 1963, that neither the Commission nor its White licensees may utilize the Inn Keepers Statute, 24 *Del. C.* § 1501, as a reason to deprive any citizen of this state—whether White or Colored—of his or their equal rights to purchase alcoholic liquors, since the privilege to do so is based and emanates from State Law and a Commission set up to administer that law. In particular I stress the above cited language of Mr. Justice Clarke,

speaking for the majority in Burton, and rule that the Commission, by its inaction, cannot lend support to the now discredited refusals of the White licensees, if based solely on the race or color of a citizen. See also *Peterson v. Greenville*, considered post.

If there was any doubt on the question, all such doubt was diffused and swept away by the rulings made by the Supreme Court of the United States on May 20, 1963, *Peterson et al. v. Greenville*, 83 S.Ct. 1119 and *Lombard, et al. v. Louisiana*, 83 S.Ct. 1122, see particularly concurring opinions of Mr. Justice Douglass. Further consideration is given to the relevancy of these rulings, see pages 40, et seq.

Nowhere in the record certified to the Court by the Commission does it appear that before passing on the applications, it ever investigated any discriminatory practices exercised by its licensees or gave consideration thereto. Thus, the question arises as to whether the Commission fulfilled its obligations as imposed by 4 *Del. C.* § 541(a), providing that the "Commission shall examine all applications for licenses" and *surely that means the examination must disclose what is obvious*—so thus brought into operation the factors considered supra pages 310, 311.

Surely, in light of the rulings in Moore and in Burton, the Court must rule that because of the combination of powers possessed by the Commission, it was bound, in the course of its investigation of the applications, to ascertain the policies of its White licensees, and to determine what extent, if any, their policies might prejudice the rights of all citizens of this state, White and Negro—including the Appellant and those for whom he is asserting noted constitutional rights—and thus deny them equal protection of the law. The Commission, through its own employees and agents, investigates and assumedly it did

so here; the Commission also adjudicates and acting on its investigator's reports made an adjudication on and rejected Appellant's application, to his prejudice.

Since the Commission determined not to grant the license upon the basis of its own investigation and, since the law afforded no opportunity to the applicant to insist on a hearing before the Commission so as to present the crucial facts here urged by him, Appellant's only recourse was to supply on this appeal and call attention by the statement of his grounds on appeal and by his affidavit filed with the Court—and adduce the evidence thereafter adduced which demonstrated these facts: (1) the failure of the Commission to ascertain critical facts bearing on the constitutional rights of Negroes affected by the policies of White licensees; (2) a failure on the Commission's part to exercise a sound discretion in considering his application; (3) the absence of evidentiary support for the reason the Commission proffers for refusal of Appellant's application; and (4) error on the Commission's part to insist on and achieve equal protection of the laws on the part of its licensees to all citizens in the Delaware City area in the sale of alcoholic liquors. Since these are all true, as is shown hereafter, Appellant has demonstrated his case and is entitled to his sought for relief.

On all the evidence before me I am forced to conclude there is no proper evidence to support the Commission's action; that it has not been shown that the Commission soundly exercised its discretion; the contrary has been clearly demonstrated, and there has been a denial of equal protection of the laws to all citizens—White and Colored—living in the Delaware City area to exercise their rights in the sale of alcoholic liquors in such area.

Appropriate consideration must, of course, be made of the Commission's claim that it was unaware that

Appellant was a Negro. See Burton, supra. Assuming this to be true from an examination of the applications without more, surely in the course of its investigation its investigators could[14] have learned this. Had their investigation been complete it would have shown that Appellant was a Colored Person and that Colored Persons in the "area" were being given discriminatory treatment by the Commission's White licensees, particularly as to service of drinks for "on" premises consumption. Consequently, this Court is of the opinion it was the Commission's duty, in light of what had been learned in the Moore case and the Burton case, to instruct its investigators to ascertain how its White licensees were utilizing their licenses in the Delaware City area, particularly how they were using their licenses in the sale—on premises as well as off premises—of intoxicants to Colored citizens of the community. It won't do for the Commission to say it did not learn the race of applicant or it was ignorant of such practices; the Court is convinced the Commission was under a duty to learn all the facts[15] because, as was said by this Court in *Caras v. Commission,* 8 Terry 268, 90 A.2d 492, 494 (Super.Ct.1952) :

"*The * * * Commissioner* cannot arbitrarily refuse to grant a license to an applicant but *must consider the existing conditions in the locality * * * and determine* whether an additional licensed place is necessary to properly serve the public interest and convenience." (Emphasis supplied)

---

[14]See page 300 et seq., supra, which reflect what the Commission learned of conditions in the Delaware City area from subsequent inquiry, made at the direction of the Court following the first Court hearing. See also page 307 et al., supra, regarding the factors an Administrative Agency should ascertain and consider in examining applications for licenses.

[15]See *Park Distributing Co. v. Commission,* considered supra 303.

The Commission could not "consider the existing conditions in the locality" unless its investigators had been instructed to investigate and obtain, for use by the Commission, complete knowledge of all "the existing conditions in the locality." Only if the Commission had all the facts before it, as might relate to the issues, could it properly "determine whether an additional licensed place" was "necessary to properly serve the public interest and convenience"; and that necessary information of "the existing conditions" required knowledge of discriminatory practices, if any, of its White licensees towards the Colored citizens of the community and if the applicant was White or Colored.

In *American Trucking Assn. v. U. S.,* 326 U.S. 77, p. 83 et seq., 65 S.Ct. 1499, 1502 et seq. 89 L.Ed. 2065 (1945) the Supreme Court of the United States discussed what might be said to be the duty of an administrative agency, charged with issuance of licenses, issuable where public convenience and necessity are a factor, and had to be determined in the grant or refusal of such licenses, and that Court indicated the duty included that the agency have available and to give consideration to all testimony or evidence and was required to "weigh" all "available material evidence as to the probable effect of the proposals * * *". The "[I.C.C.] Commission" said the Court, "must * * * consider the disadvantage to the public * * *. Those affected are entitled to fully develop the bearing of the proposals on [those persons whose interests are involved]. The discretion of the Commission should be exercised after consideration of all relevant information." 326 U.S. at p. 86, 65 S.Ct. at p. 1503, 89 L.Ed. 2065. ¶Surely if the administrative body is required to consider "all relevant information", it necessarily follows that the agency is under a duty to ascertain—to learn, to acquire and have available before it—"all relevant information" need-

ed to determine the question presented. This must be particularly so here, since an applicant under the law, 4 *Del. C.* § 541(a), supra at p. 298, has no right to a hearing— he is forced, in the first instance to rely on the Commission's investigation, and only can adduce evidence in Court on a point if it is demonstrated his rights are prejudiced because of the Commission's inadequate record.

The cited case is the only one that could be found, in the time available, which relates to the right of an interested party to have the administrative agency have before it and consider all relevant evidence in a matter involving an adjudication on a question of the issuance of a license requiring a finding of "public convenience and necessity". Another case, however, which expresses substantially the same rule where the administrative agency is faced with an exercise of legislative power—rule making power—in promulgating regulations of future applicability to particular situations is *Consolidated Edison Co. of New York v. Labor Board,* 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938). There the Supreme Court modified and then affirmed the Court of Appeals, 95 F.2d 390 (Ct. of App. 2d Cir. 1938) in which case the Court of Appeals, Second Ciricuit, 95 F.2d 390, 395, 397, had indicated the administrative agency had acted "unreasonable and arbitrary" in not taking available evidence, material to a point in controversy. This ruling, in effect, was approved by the United States Supreme Court, 305 U.S. at pages 225-228, 59 S.Ct. at page 215. That there was not a reversal of the agency's determination seems to be based on failure of the appealing party to have availed itself of statutory relief, see 95 F.2d at page 397.

The Court stresses that in the cited cases the law and rules of the administrative agencies afforded the aggrieved party a right to a hearing and the opportunity to present

evidence, while here, as appears from 4 *Del. C.* § 541(a), supra, p. 298, there is no absolute right in an applicant to present a case and testimony to the Commission by submission of the available evidence in the Court's judgment, that would seemingly require the Commission to be under a higher duty to take all the steps necessary to ascertain if there is any evidence which might probably affect the grant or refusal of the license. See *American Trucking Assn. v. U. S., supra.*

 Some discussion of applicable decisions of the United States Supreme Court involving the "equal protection of laws" clause in the Fourteenth Amendment and the use of State Court process in the enforcement thereof may be desirable so that all concerned will realize how and why the Court reaches the result here announced, particularly because I rule[16] the Inn Keepers' Statute, 24 *Del. C.* § 1501, can no longer be given effect in licensed establishments; no place of business which is licensed by public authority as a condition of operation can "discriminate" and base their policy of discrimination on the Inn Keepers' Statute, see *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45, particularly 365 U.S. 726, 81 S.Ct. 862, 6 L.Ed.2d 45—if the policy is "based exclusively on color"; and see *Peterson v. Greenville* and *Lombard v. Louisiana,* discussed post.

The Slaughter House cases, 16 Wall 36, 21 L.Ed. 394 possibly present a proper place to start; *Yick Wo v. Hopkins,* is discussed post. There are, of course, other cases that followed but need not be considered here.

The first case of real importance which squarely dealt with the question here presented was *Buchanan v. Warley, supra.* In that case it was ruled, 245 U.S. 82, 38 S.Ct. 20,

---

[16]See discussion in footnote 13.

62 L.Ed. 149, that State Courts could not lend their aid to the enforcement of an ordinance of the City of Louisville which would have prevented a person of the Colored Race to buy property within a designated area, thus denying him "equal protection of the laws".

*Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441, reversing 335 Mo. 814, 198 S.W.2d 679 (1947) then followed. The Supreme Court of the United States there ruled (1948) that State Courts—and the holding is equally applicable to State Administrative Agencies—could not lend their aid or powers to the enforcement of private contracts, if in doing so, any denial of constitutional rights, such as a denial of the equal protection clause, would result, because to do this would amount to "state action", and there can be no "state action" if any "discriminatory" practices would result and if there would be any denial of the equal protection clause of the Fourteenth Amendment to the Federal Constitution.

The concepts there stated have been held to go so far as to apply to sought for State Court relief in the form of an award of damages for violation of a covenant in a deed to restrict ownership of property, as against Negroes, *Barrows v. Jackson,* 346 U.S. 249, 254, 73 S.Ct. 1031, 1033, 97 L.Ed. 1586 (1953), if premised "solely on the basis of race".

*Brown v. Kansas* (1954) 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 was then decided. The United States Supreme Court there ruled a state could not "solely on the basis of race", by constitution or statute, deprive children of the Negro race "equal educational opportunities", as this would be "a deprivation of the equal protection of the laws" guaranteed to them by the Fourteenth Amendment to the Federal Constitution, 347 U.S., pp. 493—495, 74 S. Ct., pp. 691-692. The cited case once and for all times

stated—and re-emphasized a previously well recognized legal principle—that state could not enforce or lend any of their powers to aid in the enforcement of any "State imposed discriminations against the Negro race" regardless of the means utilized to impose any such "discriminations"; it also overruled and rejected a case, *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), which had recognized racial discrimination—if "separate but equal" facilities were made available to the two races. The Moore case supra, (1950) 6 Terry 569, 572, 77 A.2d 74, 76 —decided prior to *Brown v. State*—may be sustained under the then recognized doctrine of *Plessy v. Ferguson,* supra.

It has been said that Chief Justice Warren's opinion in *Brown v. Kansas* was to be limited to "the field of public education", 347 U.S. 495, 74 S.Ct. 692, but subsequent Court decisions have not so limited the doctrine of *Brown v. Kansas,* compare *Burton v. Wilmington Parking Authority,* as illustrative, and several decisions that followed; the all sweeping application of recent rulings shows it is applicable whenever and wherever there is "public action" involved. See *Watson v. Memphis,* post, p. 325.

These cases just discussed have involved "positive action" by public authorities in denying equal protection of the law. What, however, is the situation where the public authorities do nothing and have done nothing positively—merely have not acted to insure equal protection of the laws being enforced in the interests of all citizens—have only been "inactive"? See Burton, supra, pp. 28 and 44; *Lombard v. Louisiana,* considering *Marok v. Alabama* and *German Alliance Inc. Co.*

On first examination it seemed that *Shelley v. Winters, supra,* was authority for the principle that there must be some positive action to insure there is no denial of

"equal protection of the laws" since it held that the Courts —and that includes State Administrative Agencies, Missouri ex rel. *Gaines v. Canada*, 305 U.S. 337, 343, 59 S.Ct. 232, 234, 83 L.Ed. 208 (1938) and Burton, post 340—could not lend their powers, authority and prestige to the enforcement of "legal rights", whether in civil matters—involving private controversies—or in matters involving "public action"; where a citizen claims to suffer discrimination in instances involving "a denial of equal protection"—because of the action or inaction on a public matter at the hands of a State Agency—or in a criminal matter, see *Bob-Lo Excursion Co. v. Michigan*, 333 U.S. 28, 68 S.Ct. 358, 92 L.Ed. 455 (1948). The case may or may not be authority for the rule, but it is not necessary to limit one's premise on the Court's conclusion in *Shelley v. Winters*, because it has long been well recognized, *Yick Wo v. Hopkins*, 118 U.S. 356, 373, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) that unequal administration of a statute or ordinance by public authorities amounts to an unconstitutional discrimination by the State. Such principle has been applied many times and as recently as 1938 the U.S. Supreme Court took the occasion, in Missouri ex rel. *Gaines v. Canada*, 305 U.S. 337, 351, 59 S.Ct. 232. 237, 83 L.Ed. 208, to observe:

"Here, petitioner's right was a personal one. It was as an individual that he was entitled to the equal protection of the laws, and the State was bound to furnish him * * * facilities * * * substantially equal to those which the State * * * afforded for persons of the white race, whether or not other negroes sought the same opportunity." See also *Bob-Lo Excursion Co. v. Michigan, supra,* particularly concrrring opinion of Mr. Justice Douglass, 333 U.S. at p. 41, 68 S.Ct. at p. 365, where he stated:

"* * * The common-law duty of carriers was to provide equal service to all, * * *.

"And the police power of a State * * * is adequate for the protection of the civil rights of its citizens against discrimination by reason of race or color. * * *"
Compare too *Wilmington Housing Authority v. Burton*, supra, considering the application of the Delaware Inn Keepers' Statute, 24 *Del. C.* § 1501, and whether the Eagle Restaurant was a"tavern" as therein contended and as such should be included within the coverage of the common law of a "restaurant", which would sustain a policy approving public or state inaction in these matters.

The cited principle of public inaction in the administration of a law has been applied in criminal cases where a public officer has discrimnated between White citizens and Negro citizens, arrested for law violations, see *Catlette v. U. S.*, 132 F.2d 902 (4th Cir.1943) and *Lynch v. U.S.*, 189 F.2d 476, 479 (4 Cir.1951), and in the last cited case the Court of Appeals made this very striking comment:

"* * * There was a time when the denial of equal protection of the law was confined to affirmative acts, but the law now is that culpable official inaction may also constitute a denial of equal protection. * * *"

The rulings by the U. S. Supreme Court on May 20, 1963 are next to be considered. In *Peterson v. Greenville*, Chief Justice Warren, speaking for the majority of the Court, said, where the case presented an instance of a prosecution of a criminal trespass statute of South Carolina, and the evidence showed only that the basis of prosecution was that the accuseds were Negroes, seeking service at a lunch counter, and otherwise were not acting in violation of the statute: 373 U.S. 244, 83 S.Ct. 1119, at 1121. 10 L.Ed.2d 323.

"* * * Petitioners * * * assert that they have been deprived of the equal protection of the laws secured

to them against state action by the Fourteenth Amendment. We need decide only the last of the questions thus raised.

"The evidence in this case establishes beyond doubt that the Kress management's decision to exclude petitioners from the lunch counter was made because they were Negroes. It cannot be disputed that under our decisions '[P]rivate conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to have become involved in it.' *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45; *Turner v. City of Memphis,* 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762.

"It cannot be denied that here the City of Greenville, an agency of the State, has provided by its ordinance that the decision as to whether a restaurant facility is to be operated on a desegregated basis is to be reserved to it. When the State has commanded a particular result it has saved to itself the power to determine that result and thereby 'to a significant extent' has 'become involved' in, and, in fact, has removed that decision from the sphere of private choice. It has thus effectively determined that a person owning, managing or controlling an eating place is left with no choice of his own but must segregate his white and Negro patrons. The Kress management, in deciding to exclude Negroes, did precisely what the city law required.

"Consequently these convictions cannot stand, * * *."

*Lombardi, et al. v. Louisiana,* had no trespass ordinance or statute, as such, to support the prosecutions; the accuseds were tried under a "Louisiana Criminal Mischief Statute", which the Supreme Court said "has all the elements of the usual trespass statute". The prosecutions seemingly were based on statements by the Mayor of New

Orleans and the Superintendent of that City's Police Department. Because the persons charged would not leave a lunch counter maintained by a nationally known chain store they were arrested. The majority opinion notes: (373 U.S. 267, 83 S.Ct. 1122, 1125, 10 L.Ed.2d 338)

"* * * Petitioners were charged with failing to leave at the request of the store manager. There was evidence to indicate that the restaurant manager asked petitioners to leave in obedience to the directive of the city officials. He told them that 'I am not allowed to serve you here. * * * We *have* to sell to you at the rear of the store where we have a colored counter.' (Emphasis supplied) And he called the police '[a]s a matter of routine procedure.' The petitioners testified that when they did not leave, the restaurant manager whistled and the employees removed the stools, turned off the lights, and put up a sign saying that the counter was closed. One petitioner stated that 'it appeared to be a very efficient thing. everyone knew what to do.' The store manager conceded that his decision to operate a segregated facility 'conform[ed] to state policy and practice' as well as local custom. When asked whether 'in the last 30 days to 60 days [he had] entered into any conference with other department store managers here in New Orleans relative to sit-in problms,' the store manager stated: '[w]e have spoken of it.' The above evidence all tended to indicate that the store officials' actions were coerced by the city. But the evidence of coercion was not fully developed because the trial judge forbade petitioners to ask questions directed to that very issue.

"But we need not pursue this inquiry further. A State, or a city, may act as authoritatively through its executive as through its legislative body. See Ex parte Virginia, 100 U.S. 339, 347, 25 L.Ed. 676. As we interpret

the New Orleans city officials' statements, they here determined that the city would not permit Negroes to seek desegregated service in restaurants. Consequently, the city must be treated exactly as if it had an ordinance prohibiting such conduct. * * *"

At a later point, the opinion stresses: (373 U.S. 274, 83 S.Ct. at 1125, 10 L.Ed. 2d 338.)

"* * *. * * * the State cannot achieve the same result by an official command which has at least as much coercive effect as an ordinance. The official command here was to direct continuance of segregated service in restaurants, and to prohibit any conduct directed toward its discontinuance; it was not restricted solely to preserve the public peace in a nondiscriminatory fashion in a situation where violence was present or imminent by reason of public demonstrations. * * *"

It is worth noting the language of Mr. Justice Douglass in the Lombard case: (373 U.S. 274, 83 S.Ct. at 1126, 10 L.Ed. 338.)

"* * *. * * * the Bill of Rights, as applied to the States through the Due Process Clause of the Fourteenth Amendment, casts its weight on the side of the privacy of homes. The Third Amendment with its ban on the quartering of soldiers in private homes radiates that philosophy. The Fourth Amendment, while concerned with official invasions of privacy through searches and seizures, is eloquent testimony of the sanctity of private premises. For even when the police enter private precincts they must, with rare exceptions, come armed with a warrant issued by a magistrate. A private person has no standing to obtain even limited access. The principle that a man's home is his castle is basic to our system of jurisprudence.

"But a restaurant, like the other departments of this retail store where Negroes were served, though private property within the protection of the Fifth Amendment, has no aura of constitutionally protected privacy about it. Access by the public is the very reason for its existence.

" 'Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.' *Marsh v. Alabama,* 326 U.S. 501, 506, 66 S.Ct. 276, 278, 90 L.Ed. 265.

"The line between a private business and a public one has been long and hotly contested. *New State Ice Co. v. Liebmann,* 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747, is one of the latest cases in a long chain. The Court, over the dissent of Mr. Justice Brandeis and Mr. Justice Stone, held unconstitutional an Oklahoma statute requiring those manufacturing ice for sale and distribution to obtain a license from the State. Mr. Justice Brandeis' dissent was in the tradition of an ancient doctrine perhaps best illustrated by *German Alliance Ins. Co. v. Kansas,* 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, which upheld a Kansas statute that regulated fire insurance rates. Mr. Justice McKenna, writing for the Court, said, 'It is the business that is the fundamental thing; property is but its instrument, the means of rendering the service which has become a public interest.' Id., 408, 34 S.Ct. 617. *Cf. Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028 [10 L.Ed.2d 93].

"Some of the cases reflect creative attempts by judges to make innkeepers, common carriers, and the like perform the public function of taking care of all travelers. Others involve the power of the legislature to impose various kinds of restraints or conditions on business. As a result of the conjunction of various forces, judicial and legisla-

tive, it came to pass that 'A large province of industrial activity is under the joint control of the market and the state.'

"The present case would be on all fours with the earlier ones holding that a business may be regulated when it renders a service which 'has become a public interest' *(German Alliance Ins. Co. v. Kansas,* supra, 233 U.S. 408, 34 S. Ct. 617) if Louisiana had declared, as do some States, that a business may not refuse service to a customer on account of race and the proprietor of the restaurant were charged with violating this statute. We should not await legislative action before declaring that state courts cannot enforce this type of segregation. * * *"

Mr. Justice Douglass called attention to fundamental common law principles which seemingly lend support to the rulings of May 20, 1963: (373 U.S. 278, 83 S.Ct. at 1127, 10 L.Ed.2d 338)

"Common-law judges fashioned the rules governing innkeepers and carriers. As stated by Holt, C. J., in *Lane v. Cotton,* 12 Mod. 472, 484 (1701):

" '[W]herever any Subject takes upon himself a Publick Trust for the Benefit of the rest of his fellow Subjects, he is eo ipso bound to serve the Subject in all the Things that are within the Reach and Comprehension of such an Office, under Pain of an Action against him. * * * If on the road a Shoe fall off my Horse, and I come to a Smith to have one put on, and the Smith refuse to do it, an Action will lie against him, because he has made Profession of a Trade which is for the Publick Good, and has thereby exposed and vested an interest of himself in all the King's Subjects that will employ him in the Way of his Trade. If an Innkeeper refuse to entertain a Guest, when his House

is not full, an Action will lie against him; and so against a Carrier, if his Horses be not loaded, and he refuse to take a Packet proper to be sent by a Carrier.'

"Judges who fashioned those rules had no written constitution as a guide. There were, to be sure, criminal statutes that regulated the common callings. But the civil remedies were judge-made. We live under a constitution that proclaims equal protection of the laws. That standard is our guide. See *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891; *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811. And under that standard business serving the public cannot seek the aid of the state police or the state courts or the state legislatures to foist racial segregation in public places under its ownership and control. The constitutional protection extends only to 'state' action, not to personal action. * * *"

At a later point in his opinion, the learned Justice said: (373 U.S. 280, 83 S.Ct. at 1128, 10 L.Ed.2d 338)

"An innkeeper or common carrier has always been allowed to exclude drunks, criminals and diseased persons, but only because the public's interest in protecting his and his guests' health and property outweighs its interest in providing accommodations for this small group of travelers. As a general rule, innkeepers and carriers cannot refuse their services on account of race; though the rule developed in this country that they can provide 'separate but equal' facilities. And for a period of our history even this court upheld state laws giving sanction to such a rule. Compare *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, with *Gayle v. Browder,* 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed. 2d 114, affrming, D.C., 142 F.Supp. 707. But surely *Shelley v. Kraemer,* supra, and *Barrows v. Jackson,* supra, show that the day has passed when an innkeeper, carrier, housing developer, or retailer can draw a racial

line, refuse service to some on account of color, and obtain the aid of a State in enforcing his personal bias by sending outlawed customers to prison or exacting fines from them.

"Business, such as this restaurant, is still private property. *Yet there is hardly any private enterprise that does not feel the pinch of some public regulation—from price control, to health and fire inspection, to zoning, to safety measures, to minimum wages and working conditions, to unemployment insurance. When the doors of a business are open to the public, they must be open to all regardless of race* if apartheid is not to become engrained in our public places. It cannot by reason of the Equal Protection Clause become so engrained with the aid of state courts, state legislatures, or state police." (Emphasis supplied)

In an unanimous opinion filed May 27, 1963 the United States Supreme Court, said in *Watson v. Memphis*, supra, (373 U.S. 526, 83 S.Ct. 1314, 1316):

"* * * the applicability here of the factors and reasoning relied on in framing the 1955 decree in the second Brown decision, [349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083,] * * *, which contemplated the possible need of some limited delay in effecting total desegregation of public schools, must be considered not only in the context of factual similarities, if any, between that case and this one, but also in light of the significant fact that the governing constitutional principles no longer bear the imprint of newly enunciated doctrine. * * * *we cannot ignore the passage of a substantial period of time since the original declaration of the manifest unconstitutionality of racial practices such as are here challenged, the repeated and numberous decisions giving notice of such illegality, and the many intervening opportunities heretofore available to attain the equality of treatment which the*

*Fourteenth Amendment commands the States to achieve.* These factors must inevitably and substantially temper the present import of such broad policy considerations as may have underlain, even in part, the form of decree ultimately framed in the Brown case. Given the extended time which has elapsed, it is far from clear that the mandate of the second Brown decision requiring that desegregation proceed with 'all deliberate speed' would today be fully satisfied by types of plans or programs for desegregation of public educational facilities which eight years ago might have been deemed sufficient. Brown never contemplated that the concept of 'deliberate speed' would countenance indefinite delay in elimination of racial barriers in schools, let alone other public facilities not involving the same physical problems or comparable conditions. (Emphasis supplied)

\*　　　\*　　　\*　　　\*　　　\*　　　\*

"\*　\*　\* Desegregation of \*　\*　\* recreational facilities does not present the same kinds of cognizable difficulties inhering in elimination of racial classification in schools, at which attendance is compulsory, the adequacy of teachers and facilities crucial, and questions of geographic assignment often of major significance.

▆▆▆ "\*　\*　\* The rights here asserted are, like all such rights, present rights; they are not merely hopes to some future enjoyment of some formalistic constitutional promise. *The basic guarantees of our Constitution are warrants for the here and now and, unless there is an overwhelmingly compelling reason, they are to be promptly fulfilled.* \*　\*　\* (Emphasis supplied)

"Solely because of their race, the petitioners here have been refused the use of \*　\*　\* recreational facilities which the Constitution mandates be open to their enjoyment on equal terms with white persons. \*　\*　\* The

claims of the city to further delay in affording the petitioners that to which they are clearly and unquestionably entitled cannot be upheld except upon the most convincing and impressive demonstration by the city that such delay is manifestly compelled by constitutionally cognizable circumstances warranting the exercise of an appropriate equitable discretion by a court. In short, the city must sustain an extremely heavy burden of proof.

* * * * * *

"The findings of the District Court disclose an unmistakable and pervasive pattern of local segregation, which, in fact, the city makes no attempt to deny, but merely to justify as necessary for the time being. * * *

 "The city * * * states here, that its good faith in attempting to comply with the requirements of the Constitution is not in issue, and contends that gradual desegregation on a facility-by-facility basis is necessary to prevent interracial disturbances, violence, riots, and community confusion and turmoil. The compelling answer to this contention is that constitutional rights may not be denied simply because of hostility to their assertion or exercise. * * * This is really no more than an application of a principle enunciated much earlier in Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149, a case dealing with a somewhat different form of state-ordained segregation—enforced separation of Negroes and whites by neighborhood. An unanimous Court in striking down the officially imposed pattern of racial segregation there in question, declared almost a half-century age: 'It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordin-

ances which deny rights created or protected by the federal Constitution.' 245 U.S. at 81, 38 S.Ct., at 20, 62 L.Ed. 140. (Emphasis supplied)

\* \* \* \* \* \*

"The existing and commendable goodwill between the races in Memphis, to which both the District Court and some of the witnesses at trial made express and emphatic reference as in some inexplicable fashion supporting the need for further delay, can best be preserved and extended by the observance and protection, not the denial, of the basic constitutional rights here asserted. *The best guarantee of civil peace is adherence to, and respect for the law.* (Emphasis supplied)

\* \* \* \* \* \*

"Since the city has completely failed to demonstrate any compelling or convincing reason requiring further delay in implementing the constitutional proscription of segregation of publicly owned or operated recreational facilities there is no cause whatsoever to depart from the generally operative and here clearly controlling principle that *constitutional rights are to be promptly vindicated. The continued denial* to petitioners of the use of city facilities *solely because of their race is without warrant.* Under the facts in this case, the District Court's undoubted discretion in the fashioning and timing of equitable relief was not called into play; rather, *affirmative judicial action was required to vindicate plain and present constitutional rights.* \* \* \*, *the solution to the problems growing out of race relations 'cannot be promoted by depriving citizens of their constitutional rights and privileges.'* Buchanan v. Warley, supra, 245 U.S. at 80-81, 38 S.Ct. at 20, 62 L.Ed. 149. (Emphasis supplied) \* \* \*."

History amply demonstrates that "turmoil", "disorders", even "violence" follow changes in the social, political

and economic thinking of people, and their status in general. There are those who have had and defend as "vested rights" certain social, economic and political preferments based on the political or economic philosophy of any given period in history as against those whom they regard as "intruders". Such can be the explanation of what is going on in our country of late—especially in the southern states, although not in any sense can it be said such alleged discriminatory practices are localized there; they are seemingly found everywhere.

The violence attendant on these changes is readily apparent in our own country, see Fiske, The Critical Period of American History, published 1899, Houghton, Mifflin and Company, pages 55, et seq., 80, 92, 101, 112, 120, 145, 148 and 269; Bancroft's History of the Constitution of the United States, published 1903, D. Appleton and Company; and Kelly and Harbison, The American Constitution, published 1948, W. W. Norton & Company, Chapters 3 (pages 64, 65 and 79), 6 (pages 148-156) 7, 10, 12, 15 and 19.

Chapters IV, V, VI, VII, X, XI, XII, XV, XIX, XX, XXL, XXIV, XXV and XXXVII of Schapiro's Modern and Contemporary European History, Houghton, Mifflin Company, 1942, bring out these violences, as they arose in Europe and other countries, with the emergence and manifestations of Nationalism and the so-called democratic movements. This work shows what happened in Europe as those holding the "vested rights" strove to protect them against those who would invade and take away some or even all of such "vested rights." Arnold Whitridge's Essay—Men in Crisis—published 1949 by Charles Scribner's Sons, together with the Bibliographical Notes, appearing as an Appendix, throws much light on these sociological, economic, and political changes, as does William Henry

Chamberlain's work, The Russian Revolution, 1917-1921, published by MacMillan Company, 1957, particularly Chapters III, VIII, IX, X, XI and XV.

True these cited works cover different eras, different changes and different countries, but they are single in their meaning as explanations of social, economic and political changes in the past three centuries and resulting "violences".

I pause to quote from Fiske, supra, at page 120:

"* * *. Congress, as we have seen, was bound by the treaty to recommend to the several states to desist from the persecution of Tories, [those sympathetic to English ties] and to give them an opportunity of recovering their estates; and it had been further agreed that all private debts should be discharged at their full value in sterling money. It now turned out that Congress was powerless to carry out the provisions of the treaty upon either of these points. The recommendations concerning the Tories were greeted with a storm of popular indignation. Since the beginning of the war these unfortunate persons had been treated with severity both by the legislatures and by the people. Many had been banished; others had fled the country, and against these refugees various harsh laws had been enacted. Their estates had been confiscated, and their return prohibited under penalty of imprisonment or death. Many others, who had remained in the country were objects of suspicion and dislike in states where they had not, as in New York and the Carolinas, openly aided the enemy or taken part in Indian atrocities. Now, on the conclusion of peace, in utter disregard of Congress, fresh measures of vengeance were taken against these 'fawning spaniels', as they were called, these 'tools and minions of Britain.' An article in the 'Massachusetts Chronicle' expressed the common feeling: 'As Hannibal

swore never to be at peace with the Romans, so let every Whig swear, by his abhorrence of slavery, by liberty and religion, by the shades of departed friends who have fallen in battle, by the ghosts of those of our brethren who have been destroyed on board of prison-ships and in loathsome dungeons, never to be at peace with those fiends the refugees, whose thefts, murders, and treasons have filled the cup of woe.' *Tons* of pamphlets, issued under the customary Latin pseudonyms, were filled with this truculent bombast; and like sentiments were thundered from the pulpit by men who had quite forgotten for the moment their duty of preaching reconciliation and forgiveness of injuries. Why should not these wretched, it was sarcastically asked, be driven at once from the country? Of course they could not desire to live under a free government which they had been at such pains to destroy. Let them go forthwith to his majesty's dominions, and live under the government they preferred. It would never do to let them stay here, to plot treason at their leisure; in a few years they would get control of all the states, and either hand them over to Great Britain again, or set up a Tory depotism on American soil. Such was the rubbish that passed current as argument with the majority of the people. * * *."

It seems hard to believe now, but Fiske points out (page 230):

"The Federal Convention [at which our Federal Constitution was adopted] did wisely in withholding its debates [of the Convention] from the knowledge of the people. It was felt that discussion would be more untrammelled, and that its result ought to go before the country as the collective and unanimous voice of the convention. There was likely to be wrangling enough among themselves; but should their scheme be unfolded, bit by bit, before its parts could be viewed in their mutual relations.

popular excitement, would become intense, there might be riots, and an end would be put to that attitude of mental repose so necessary for the constructive work that was to be done. It was thought best that the scheme should be put forth as a completed whole, and that for several years, even, until the new system of government should have had a fair trial, the traces of the individual theories and preferences concerned in its formation should not be revealed. * * *."

All of these thoughts help in the comprehension of the result announced and reasoning stated in Mr. Justice Goldberg's opinion in *Watson v. Memphis.* Recollecting back to the "disorders" resulting from and as a consequence of the great Pullman Strike (1894) and the Coal Strike that took place at the end of the last and beginning of the present century, helps in the comprehension of how "fleeting"—viewed in the future—will be the present "violences" caused by "discriminatory practices" and the rulings of the Supreme Court.

The opening paragraph at page 3 of Chapter 1 of the revised edition of Racial and Cultural Minorities, by Simpson and Yinger, published 1958 by Harper and Brothers, sets the theme for any consideration of the present situation as presented by the facts of this case:

"Whenever one looks in these dramatic times, the puzzling phenomena of intergroup relations leap to attention. Civil rights, prejudice, desegregation, discrimination, cultural pluralism, apartheid, genocide—these are terms the student of contemporary life must learn to use. England, with a steady migration of persons from Africa and the West Indies, finds herself faced with problems of a color bar; France, struggling with an enormously difficult question in Algiers, which she can neither hold nor relinquish, is caught in part by the antipathies between

Algerians of French and of African descent; Indonesians cheer the expulsion of the Dutch, only to find themselves dominated by internal groups scarcely less 'imperialistic'; the South African government boldly proclaims a policy of apartheid but keeps stumbling over the problem of economic interdependence; the United States, rapidly becoming a thoroughly urbanized society, discovers that desegregation is a national question; Russia, faced with difficult problems at home and a vast restlessness among her satellites, reverts again to anti-Semitism. How shall we seek to understand these developments? To what system of concepts shall we turn?"

The authors cited at page 119, from pages 230-231 of Ruth Benedict's work—Continuities and Discontinuities in Cultural Conditioning:

"Persecution was an old, old story before racism was thought of. Social change is inevitable, and it is always fought by those whose ties are to the old order. * * *. Those who have these ties will consciously or unconsciously ferret out reasons for believing that their group is supremely valuable and that the new claimants threaten the achievements of civilization. They will raise a cry of rights of inheritance or divine rights of kings or religious orthodoxy or racial purity or manifest destiny. These cries reflect the temporary conditions of the moment, and all the efforts of the sloganmakers need not convince us that any one of them is based on eternal verities."

Then, continuing their own discussion (Id.) the authors took occasion to note:

"Once race differences had become established as symbols of superiority-inferiority, they were used as weapons in many group conflicts. Until the French Revolution there had been little racial prejudice; but by that time the slave

trade had become a big business. The nominally Christian slave trader found belief in the inferiority and even non-human nature of the Negro a very convenient idea. When the British first established economic interests in India, they encouraged intermarriage with the native population. When, however, the mixed-bloods threatened to outnumber the whites and began to offer competition for positions—particularly minor managerial and administrative jobs—the racial policy changed and a pattern of acute racial discrimination appeared. As Charles Johnson said: 'The Indians and mixed bloods were relegated to a fixed economic subordination, and their consequent poverty and degradation were used to justify the judgment of an inherent degeneracy and shiftlessness and unfitness for the society of the English.'

"Race prejudice was not only a weapon of imperialism, as in Africa and India, but a weapon of class conflict within many nations.[17] In the eighteenth century the Count de Boulainvilliers, an admirer of feudalism, tried to oppose not only the peasantry but Louis XIV as well by claiming that the nobles, who were losing their autonomous power to the absolute monarch, were of superior 'Teuton' blood. To attack their power was to destroy the racial leadership of France. It was not until the nineteenth century, however, that this idea was widely used. In The Inequality of Human Races, de Gobineau declared that the hope of the world was the fairhaired Teutons—'Aryans'. All the countries of Europe had been swamped by 'Gallo-Romans' while the racial aristocrats were being destroyed. The revolutionary movements of 1848 were, to de Gobineau, an uprising of racial trash. Since the

---

[17]See Balmes, European Civilization, published 1850, John Murphy Co., Baltimore, Chapters XV-XIX; Social Ethics, Herder Book Co., 1949, pp. 202-207.

masses were innately inferior, the democracy and liberalism for which they fought were impossible. Thus he fought a class battle with racism."

In January of 1963 a conference of many religious leaders of this country was held in Chicago; from it came a collection of Essays of appeal and are worthwhile reading for those interested in the legal development of what is now our great constitutional principle of "equal protection of the law". It is entitled Challenge of Religion. Rabbi Abraham J. Heschel is quoted therein at page 56—

"Few of us seem to realize how insidious, how racial, how universal an evil racism is. Few of us realize that racism is man's gravest threat to man, the maximum of hatred for a minimum of reason, the maximum of cruelty for a minimum of thinking."

At page 64 Rabbi Heschel stated—

"That equality is a good thing, a fine goal, may be generally accepted. What is lacking is a sense of the monstrosity of inequality. Seen from the perspective of prophetic faith, the predicament of justice is the predicament of God.

"Of course, more and more people are becoming aware of the Negro problem, but they fail to grasp its being a personal problem. People are increasingly fearful of social tension and disturbance. However, so long as our society is more concerned to prevent racial strife than to prevent humiliation, the cause of strife, its moral status will be depressing, indeed.

"The history of inter-racial relations is a nightmare. Equality of all men, a platitude to some minds, remains a scandal to many hearts. Inequality is the ideal setting for the abuse of power, a perfect justification for man's cruelty to man. Equality is an obstacle to callousness, setting a

limit to power. Indeed, the history of mankind may be described as the history of the tension between power and equality.

"Equality is an inter-personal relationship, involving both a claim and a recognition. My claim to equality has its logical basis in the recognition of my fellow men's identical claim. Do I not forfeit my own rights by denying to my fellow men the rights I claim for myself?

"*It is not humanity that endows the sky with inalienable stars. It is not society that bestows upon every man his inalienable rights. Equality of all men is not due to man's innocence or virtue. Equality of man is due to God's love and commitment to all men.*

"*The ultimate worth of man is due neither to his virtue nor to his faith. It is due to God's virtue, to God's faith. Wherever you see a trace of man, there is the presence of God. From the perspective of eternity our recognition of equality of all men seems as generous an act as the acknowledgment that stars and planets have a right to be.*

"*How can I withhold from others what does not belong to me?*

"*Equality as a religious commandment goes beyond the principle of equality before the law. Equality as a religious commandment means personal involvement, fellowship, mutual reverence and concern. It means my being hurt when a Negro is offended. It means that I am bereaved whenever a Negro is disfranchised.*

"The shotgun blasts that have been fired at the house of James Meredith's father in Kosciusko, Mississippi, make us cry for shame wherever we are.

"There is no insight more disclosing: God is One, and humanity is one. There is no possibility more frightening: God's name may be desecrated.

"*God is every man's pedigree. He is either the Father of all men or of no man. The image of God is either in every man or in no man.*

"*From the point of view of moral philosophy it is our duty to have regard for every man.* Yet such regard is contingent upon the moral merit of the particular man. From the point of view of religious philosophy it is our duty to have regard and compassion for every man regardless of his moral merit. *God's covenant is with all men, and we must never be oblivious of the equality of the divine dignity of all men.* The image of God is in the criminal as well as in the saint. How could my regard for man be contingent upon his merit, if I know that in the eyes of God I myself may be without merit." (Emphasis supplied)

Dr. Dan W. Dodson, a participant at the Chicago Conference, has written an Essay—The Role of Church and Synagogue in the Racially Changing Community. It appears at pages 75-90 of Challenge of Religion. His pungent, somewhat acrimonious observations, point up some of the problems that underlie and are to be found in the case at bar. At page 81 the author notes—

"Most communities in change [resulting from racial invasions of communities and neighborhoods] feel that such change downgrades them. This is particularly true of suburban neighborhoods. Almost invariably the first settlers have more status than do the newcomers. A consideration of almost any wellknown suburb such as Scarsdale, New York, Shaker, Heights, Ohio, or Westport, Connecticut, reveals that when the Jews arrive, the neighborhood considers itself to be starting a downhill slide. When

the Negroes come, they are positive of it. In past years the same arguments were used concerning those of Irish, Italian or Polish backgrounds.

*"The core problem of the discriminatory aspects of race relations would seem to be contained in a single popular word—'snootiness'. It is agreed that a community without a status ordering would flounder in dealing with its problems. However, this agreement leads us to pose the pertinent question, 'What are the criteria for status in America?' We should examine such pedestrian values as implied by length of residence in a given community, religious affiliation, racial background, or social class, and ask ourselves if service to a community should not be the real measure of worth. The substitution of service for 'snootiness' could immeasurably enrich the lives of all community members, both those with deep roots in its affairs and those who have had time to grow only tap roots."* (Emphasis supplied)

In the community of Wilmington this has been recently very obvious. As more and more Negroes came to the East Side of Wilmington—during and after World War II—the polish people who had lived there for some time moved into what is known as the Ninth Ward. Immediately the Protestant, the Scotch-Irish and the Catholic Irish of the Ninth Ward placed their homes for sale on the open market and moved to Suburban Brandywine Hundred and Christiana Hundred. When the Poplar Street Project A Re-development Plan got under way in the mid 1950's, the Polish groups who had settled in certain areas in the Ninth Ward found Negro families moving into the neighborhood. These Polish people and some Jewish families hurriedly "forced their way"—to quote some real estate dealers—from the Ninth Ward and into Brandywine Hills, a theretofore somewhat exclusive area, located north of Wilmington, and in other areas.

Now, it is stated that some Negroes are resentful of the entry into their neighborhoods of Porto Ricans, who have come to Wilmington in large numbers in recent years. When and where it will all end is uncertain; it is a typical problem which this case presents for ultimate determination—how can the law deal with and treat discrimination?

The Very Reverend John J. Egan, in his Essay, The Responsibility of Church and Synagogue as Institutions in the Community, appearing at pages 91-100 of Challenge of Religion, in my opinion, has quite properly considered the difficulty as arising from the heretofore highly regarded philosophy of Herbert Spencer—particularly in light of the attacks of Marx and Engel. Monsignor Egan aptly notes the Spencerian viewpoint and the Marxian attacks as explicit rejections of the "individual dignity" of every man and the relationship of "the entire meaning of the individual to the progress of society", see page 91, Challenge of Religion.

Monsignor Egan well observes, page 93, that "the Spencerian dictum [of a Social Darwinism] and the dictum of Das Kapital are remarkably similar. In each, the individual is meaningless except as he serves as a cog in the perfection of the race. The specific difference * * * is that the former [Marx] rejected capitalism and free enterprise; while the latter [Spencer] provided a most accommodating rationale for its abuses."

Monsignor Egan states (Id.) "the Spencerian thesis" —which he found to be expressed in textbooks used at Harvard School of Business—is "a deteriorating point of view"; and he points out "its residual effects on American Society bear a direct relationship to the problem of race relations".

Continuing (Id.) Monsignor Egan makes this comment:

"The most obvious of these residual effects is in our attitude toward the poor. Americans admit, if grudgingly and with one eye on the tax bill, that it is a good thing to give aid to the deserving poor—to those who through no fault of their own are unable to make their way in society. But the emphasis is on 'deserving'. The man who will not work, or the man whose personality apparatus prevents him from being competitive, or the lazy man, or the shiftless man, is not deserving of our help. If we must help him in order to keep him from practicing violence against the good order of the state, at least we need keep him no more than alive and submissive.

"This habitual distinction between the 'deserving' poor and the 'unfit' poor is the most compelling evidence that we do not really implement our primal religious belief in the God-related dignity of man. We are still dominated by the Spencerian dictum that man is worthy of our attention only as he actively contributes to society; only as he has a utilitarian purpose.

"Thus, while our American ethos gives lip service to the notion of the dignity of man, the practical customs by which a society implements its ethos deny this notion. *The apparent contradiction between our juridical assent to the rights of man and our treatment of minorities is more easily understood against this background. In reality, our allegiance to the rights of man is juridical only.* It has not been accompanied by the only concept which gives it meaning and ultimate rationality: Kinship in God.

"For both history and logic compel us to believe that unique individual dignity is inconceivable except as the individual relates to the Judaeo-Christian God. The Greek

city-state of Aristotle and Plato gave us perhaps the highest expression of a civilization ordered outside the framework of God the Father.

"Yet Aristotle's concept of the poor is not far different from that of Spencer. Extreme poverty, Aristotle holds, 'lowers the character of a democracy' and therefore the poor should be given means to help themselves. But let the help be only in the form of means to better themselves. If the poor do not better themselves, then aid of them is wasteful.

"Historically, it is in the Jewish and Christian tradition that the poor possess a dignity which rises above their utility and the good order of society—precisely because their dignity, as well as the dignity of all, is based upon a relationship with God that transcends the proximate purposes of society." (Emphasis supplied)

Then later, the author states (Ibid at page 95):

*"For there is a direct and vital relationship between the problem of dignity in God and the problem of race relations.* As there is no intelligible basis for aiding the poor and unfit outside of the concept of a God who is Father, there is no intelligible basis for racial tolerance outside of the concept of God who is Father. Given the assumption that there is no God of Israel, that men are left to their own devices, both the extinction of a race and the extinction of the poor are rational, economical, and humanitarian approaches to the perfectability of man. Hitler was no less rational than Spencer; and neither was less rational than the rabid southern (or northern) racist. All either explicitly or implicitly reject the fundamental basis of belief in the God of Israel.

"I have examined the problem of our attitude toward the poor,[18] nor only because it illustrates the gap in our mores of individual dignity (upon which any sound race relations must be built), but also because, in the present crisis, the poor and the racial minorities are often and extensively identified with each other. Or perhaps in a larger sense, the question of wealth and poverty has been intertwined with all minority relations in America. All immigrant groups, all minority groups, in America, have been at first poor. To be at once poor and a minority has been the lot of all our 'strangers in the land,' as the studies of John Higham and Oscar Handlin demonstrate. It has not been an easy lot. Historically, American antipathies toward the poor have blended with American antipathies toward minorities, and the sterotype still prevails. Indeed, once an immigrant group has ceased to be predominantly poor, it has ceased to be regarded as a minority in the general American consciousness. Thus, although residual and often painful prejudices still work against Catholics and Jews, the public consciousness does not place them in the same minority category as Negroes, Southern Whites, Puerto Ricans and Mexicans.

"This intertwining of identification (and hostility) toward the poor and towards minorities has profound implications for contemporary race relations." (Emphasis supplied)

In a concluding note (Ibid at page 97) the author proposes:

*"We must keep clearly in mind that race relations rest on the same basis as all other human relations: the notion of man's dignity in God.* When we practice unjust wage

---

[18]Poverty and Deprivation in the United States, published Conference on Economic Progress, Washington, D.C., April, 1962.

policies we violate the same principle as when we practice discriminatory hiring policies. When we gear our welfare institutions to serve predominantly the middleclass we repudiate human dignity as much as when we restrict our welfare programs according to race. When we approve, in our educational schema, the moral status of wealth, we display the same contempt for the creatures of God as we do when we approve the teaching of theories of racial inferiority. What is more important, *we must keep clearly in mind that love of neighbor, love, especially of the poor, is neither an intellectual position nor an elevating sentiment. It is an action.* Here Martin Buber's insight is compelling, and I quote:

" 'The Bible knows that it is impossible to command *the love of man. I am incapable of feeling love toward every man, although God Himself command me. The Bible does not directly enjoin the love of man, but by using the dative puts it rather in the form of an act of love.* (I must love "to Him.")' (Emphasis supplied)

"Love of the poor, then, rests on Buber's dative. It is an act. The Sacred Books abound with concrete injunctions to feed the hungry, clothe the naked, do kindness to the stranger, comfort the brethren. Why? God answers: 'What if he cries for redress, and I, the ever merciful, listen to him?' (Exod. 22:25). 'Remember what God you worship.' (Lev. 19:9-10). Love of the poor is an act; it is enjoyable because we are all of God, and God is the God of all.

"If then, love of the poor is the open manifestation of man's dignity in God; and if love of the poor is in the first instance the act of dative—it necessarily implies involvement. An essential element of love, of charity, of almsgiving, of the giving of comfort, is an empathy that can come only from involvement and identification. God calls

upon his people to love by recalling to their minds their own historical experience: 'You were alien once, in the Land of Egypt' (Lev. 19:34); 'Do not forget that thou wast once a slave in Egypt' (Deut. 24:19)—injunctions that are directed as much to the Christian as to the Hebrew community.

"*Love of the poor, as a matter of fact, is related to human dignity only insofar as it involves empathy. Then, says Leo XIII, 'It neither connates pride in the giver nor inflicts shame on the one who receives. The disposition to ask assistance from others with confidence, and to grant it with kindness, is part of our very nature.'*

"The spirit of empathy and understanding, the reverence for human dignity, which is an essential part of charity and love for the poor, is a value in itself: one of the prime sources of human enrichment, and a marvelous example of the way in which Divine Province draws good out of evil. * * *.

\* \* \* \* \* \*

"\* \* \*, we need to beware of the trap of putting religion in the role of a tool toward better race relations. As religious men, we reject racial intolerance not primarily because we are useful in removing it, but because it is a denial of the God of Israel. It is the people of God who alone bear the responsibility for racial intolerance. This is an awesome responsibility. Neither the Jew nor the Christian can escape it. He can only fulfill it, or fail at it; and failing at it, he bears false witness not only to his neighbor, but to God." (Emphasis supplied)

Bishop Thomas A. Fraser, Episcopal Bishop of North Carolina, on May 15, 1963, speaking at the Church Convention, struck what to me seems to be the note that should impel all men. Speaking to his own Church members Bishop Fraser said:

"\* \* \*, we still bear the image in the eyes of many people that we consider ourselves the best church for the best people rather than God's Church for all people. This image which we have earned in the past must be destroyed. The program of every congregation must be designed so that those who see us will know the Episcopal Church is God's Church for all people. It is crystal clear that one of the weaknesses in our missionary policy is that of this image of the best people and in some of the areas where we are located the best people are too few in number. \* \* \*.

"We must face this challenge to destroy this long and evil image of the Episcopal Church and to create the right image of the Church. We must place greater stress on our worship both corporate and individual. It must be worship that is well prepared—which is Christ centered—which speaks to the needs of the people where they are and holds its arms open to all people. \* \* \*. \* \* \*— people sometimes get the idea that we feel that we are the best Church[19] for the best people because we in almost a bragging way say that we are not interested in numbers. We stress that we are interested in quality and not in quantity and anyone who hears this knows that we are whistling in the dark. The facts of history are against us. It was recently said that in 1950 the Christian faith could claim 33% of the earth's population. In 1960, it had only 31%. And if we don't change our ways, in 37 years we will claim only 20%. The man in the street knows that the population of the Communist countries and other people who oppose the Christian Church and all that it stands for are multiplying a hundred fold every ten years. And we stand by and say that we are not interested in numbers. If it is true that we are not interested in num-

---

[19]See page 331.

bers, then we are planning our own suicide. If we are commited to the Gospel of Christ and His Church, then we are by commitment interested in numbers because we are interested in all people. * * *."

While the good Bishop was addressing his words to members of his own Church, what he had to say is, in substance and meaning, clearly applicable to every white person in our country. We must destroy the image we have created in the eyes of other races and minorities that we white Americans are the best people and only we know what is best for all people. If this can be done it will help in great measure to put life and meaning in and to the juridical concept[20] of "equal protection of the laws". See supra pages 331 and 332.

---

[20]At page 332, supra, Monsignor Egan refers to "The apparent contradiction between our juridical assent to the rights of man and our treatment of minorities". I venture the suggestion that the Civil Rights cases, decided in 1858, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, may have given rise to a certain hyprocrisy, by the Bench and the Bar, that has given a certain "emptiness" to the concept, while at the same time recognizing the meaning and effect of the adoption of the Fourteenth Amendment.

By its decision in the Civil Rights cases (U.S.Supr.Ct.1883) 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1885), the United States Supreme Court declared the criminal sanctions section of the Civil Rights Bill of 1875 to be unconstitutional insofar as they applied to private intrastate racial discrimination. Because so few persons seemingly have considered that decision, in light of the many others that thereafter were decided, I consider it desirable to discuss it fully.

Five cases had been brought before that Court. Two involved criminal charges for denying negroes accommodations in an inn or hotel; two involved criminal charges resulting from refusal of theatres to admit or sell tickets to negroes and the fifth involved a suit to recover a penalty for denying a negro the privilege of riding in a certain railroad car. One case arose from Kansas; another case came from the San Francisco Federal Court; a third case had arisen in a New York Federal Court; the fourth had been filed in a Federal District Court in Tennessee and the fifth arose in a Federal Circuit Court located in Missouri. Eight of the Justices held the two criminal sanctions—sections of the Civil Rights Legislation to be void and unconstitutional; only Mr. Justice Harlan, the grandfather of the present Mr. Justice Harlan dissented.

The majority said (109 U.S. 11, 3 S.Ct. 21, 27 L.Ed. 835):
"* * * It is state action of a particular character that is prohibited. *Indnvidual invasion of individual rights is not the subject-matter of the*

There may be some who will be puzzled, perhaps even confounded, by my many references to expressions of opinion, otherwise than from law books. For them I direct attention to what Mr. Justice Brewer said in *Muller v. Oregon,* 208 U.S. 412, 419, 28 S.Ct. 324, 325, 52 L.Ed. 551 (1908) :

*amendment.* It has a deeper and broader scope. *It nullifies and makes void all state legislation, and state action of every kind, which impairs the privileges and immunities of citizens of the United States,* or which injuries them in life, liberty, or property without due process of law, or *which denies to any of them the equal protection of the laws. It not only does this, but, in order that the national will, thus declared, may not be a mere brutum fulmen, the last section of the amendment invests congress with power to enforce it by appropriate legislation.* To enforce what? *To enforce the prohibition. To adopt appropriate legislation for correcting the effects of such prohibited state law and state acts, and thus to render them effectually null, void, and innocuous. This is the legislative power conferred upon congress,* and this is the whole of it. It does not invest congress with power to legislate upon subjects which are within the domain of state legislation; but to provide modes of relief against state legislation, or state action, of the kind referred to. It *does not authorize* congress to create a code of municipal law for the regulation of private rights; but to provide modes of redress against the operation of state laws, and the action of state officers, executive or judicial, when these are subversive of the fundamental rights specified in the amendment. *Positive rights and privileges are undoubtedly secured by the fourteenth amendment;* but they are secured by way of prohibition against state laws and state proceedings affecting those rights and privileges, and by power given to congress to legislate for the purpose of carrying such prohibition into effect; and such legislation must necessarily be predicated upon such supposed state laws or state proceedings, and be directed to the correction of their operation and effect. \* \* \*" (Emphasis supplied)

Then later (109 U.S. 13, 3 S.Ct. 23, 27 L.Ed. 835) the majority said: "\* \* \* In fine, *the legislation which congress is authorized to adopt in this behalf is not general legislation upon the rights of* the citizen, but corrective legislation; that *is, such as may be necessary and proper for counteracting such laws as the states may adopt or enforce,* and which by the amendment they are prohibited from making or enforcing, or such acts and proceedings as the states may commit or take, and which by the amendment they are prohibited from committing or taking. It is not necessary for us to state, if we could, what legislation would be proper for congress to adopt. It is sufficient for us to examine whether the law in question is of that character." (Emphasis supplied)

Considering the conduct of the parties involved in the case, the majority went on to rule the Civil Rights legislation insofar as it imposed criminal sanctions to be invalid. The pertinent statement (109 U.S. 14, 3 S.Ct. 23, 27 L.Ed. 835) in light of the several acts of the parties involved, is this:

*"\* \* \* It may not be amiss, in the present case, before examining the constitutional question, to notice the course of legislation, as well as expressions of opinion from other than judicial sources.* In the brief filed by Mr. Louis D. Brandeis for the defendant in error is a very copious collection of all these matters, an epitome of which is found in the margin." (Emphasis supplied)

---

Note 20—Continued

"\* \* \*. \* \* \* it steps into the domain of local jurisprudence, and lays down rules for the conduct of individuals in society towards each other, and imposes sanctions for the enforcement of those rules, without referring in any manner to any supposed action of the state or its authorities.

"If this legislation is appropriate for enforcing the prohibitions of the amendment, it is difficult to see where it is to stop. Why may not congress, with equal show of authority, enact a code of laws for the enforcement and vindication of all rights of life, liberty, and property? If it is supposable that the states may deprive persons of life, liberty, and property without due process of law, (and the amendment itself does suppose this,) why should not congress proceed at once to prescribe due process of law for the protection of every one of these fundamental rights, in every possible case, as well as to prescribe equal privileges in inns, public conveyances, and theaters. The truth is that the implication of a power to legislate in this manner is based upon the assumption that if the states are forbidden to legislate or act in a particular way on a particular subject, and power is conferred upon congress to enforce the prohibition, this gives congress power to legislate generally upon that subject, and not merely power to provide modes of redress against such state legislation or action. The assumption is certainly unsound. It is repugnant to the tenth amendment of the constitution, which declares that powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively or to the people."

Mr. Justice Harlan's dissent (109 U.S. 27, 3 S.Ct. 33, 27 L.Ed. 835) must be read to fully comprehend what was involved and to illustrate what seems so clear now to have been the fundamental error of the majority in striking down the sections held to be invalid.

He first said (Id.):

"\* \* \* The opinion in these cases proceeds, as it seems to me, upon grounds entirely too narrow and artificial. The substance and spirit of the recent amendments of the constitution have been sacrificed by a subtle and ingenious verbal criticism. 'It is not the worts of the law but the internal sense of it that makes the law. The letter of the law is the body; the sense and reason of the law is the soul.' Constitutional provisions, adopted in the interest of liberty, and for the purpose of securing through national legislation, if need be, rights inhering in a state of freedom, and belonging to American citizenship, have been so construed as to defeat the ends the people desired to aciomplish, which they attempted to ac-

Then he observed (208 U.S. 420-421, 28 S.Ct. 326, 52 L.Ed. 551):

"The legislation and opinions referred to in the margin may not be, technically speaking, authorities, and in them is little or no discussion of the constitutional question presented to us for determination, yet they are significant * * *. Constitutional questions, it is true, are not settled by even a consensus of present public opinion, for it is

---

Note 20—Continued

complish, and which they supposed they had accomplished by changes in their fundamental law. By this I do not mean that the determination of these cases shoold have been materially controlled by considerations of merely expediency or policy. I mean only, in this form, to express an earnest conviction that *the court has departed from the familiar rule requiring, in the interpretation of constitutional provisions, that full effect be given to the intent with which they were adopted."* (Emphasis supplied)

He then noted (Id.):

*"The purpose of the first section of the act of congress of March 1, 1875, was to prevent race discrimination.* It does not assume to define the general conditions and limitations under which inns, public conveyances, and places of public amusement may be conducted, but *only declares that such conditions and limitations, whatever they may be, shall not be applied, by way of discrimination, on account of race, color, or previous condition of servitude. The second section provides a penalty against any one denying, or aiding or inciting the denial, to any citizen that equality of right given by the first section,* except for reasons by law applicable to citizens of every race or color, and regardless of any previous condition of servitude.

"There seems to be no substantial difference between my brethren and myself as to what was the purpose of congress; for they say that the essence of the law is, not to declare broadly that all persons shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of inns, public conveyances, and theaters, but that such enjoyment shall not be subject to any conditions applicable only to citizens of a particular race or color, or who had been in a previous condition of servitude. The effect of the statute, the court says, is that colored citizens, whether formerly slaves or not, and citizens of other races, shall have the same accommodations and privileges in all inns, public conveyances, and places of amusement as are enjoyed by white persons, and vice versa.

"The court adjudges that congress is without power, under either the thirteenth or fourteenth amendment, to establish such regulations, and that the first and second sections of the statute are, in all their parts, unconstitutional and void." (Emphasis supplied)

the peculiar value of a written constitution that it places in unchanging form limitations upon legislative action, and thus gives a permanence and stability to popular government which otherwise would be lacking. At the same time, when a question of fact is debated and debatable, and the extent to which a special constitutional limitation goes is affected by the truth in respect to that fact, a wide-

---

Mr. Justice Harlan's dissent refers to *Prigg v. Com.*, 16 Peters 539, 10 L.Ed. 1060, 1061, decided in 1842, and what had been said there by Mr. Justice Storey.

Summarizing that holding, Mr. Justice Harlan said (109 U.S. 29, 3 S.Ct. 34, 27 L.Ed. 835):

"* * * Speaking by Mr. Justice Storey, the court laid down these propositions: That *a clause of the constitution conferring a right should not be so construed as to make it shadowy, or unsubstantial, or leave the citizen without a remedial power adequate for its protection,* when another mode, equally accordant with the words and the sense in which they were used, would enforce and protect the right so granted; *that congress is not restricted to legislation for the exertion of its powers expressly granted;* but, for the protection of rights guaranteed by the constitution, *it may employ, through legislation, such means, not prohibited, as are necessary and proper, or such as are appropriate, to attain the ends proposed; * * *."* (Emphasis supplied)

At a later point in his opinion Mr. Justice Harlan quoted from Mr. Justice Storey's opinion: (Id.)

"The court said:

"'The fundamental principle, applicable to all cases of this sort, would seem to be that when the end is required the means are given, and when the duty is enjoined the ability to perform it is contemplated to exist on the part of the funitionary to whom it is intrusted.'* (Emphasis supplied)

"Again:

"'It would be a strange anomaly and forced construction to suppose that the national government meant to rely for the due fulfillment of its own proper duties, and the rights which it intended to secure, upon state legislation, and not upon that of the Union. A fortiori, it would be more objectionable to suppose that a power which was to be the same throughout the Union should be confided to state sovereignty, which could not rightfully act beyond its own territorial limits.'"

After considering what he thought had been accomplished by the adoption of the 13th and 14th Amendments (109 U.S. 33-37, 3 S.Ct. 37-40, 27 L.Ed. 835), Mr. Justice Harlan proceeded (109 U.S. 38, 3 S.Ct. 41, 27 L.Ed. 835) then to observe:

"It remains now to inquire what are the legal rights of colored persons in respect to the accommodations, privileges, and facilities of public conveyances, inns, and places of public amusement."

spread and long-continued belief concerning it is worthy of consideration. We take judicial cognizance of all matters of general knowledge."

The Supreme Court for several years has, in deciding cases,—in fact as far back as 1844—referred to and given consideration to "expressions of opinion from other than judicial sources". See *Vidal* et al. *v. Philadelphia*, 2 How. 127, 144, 147, 149, 156, 167, 169, 171, 173, 174, 177, 199

---

Note 20—Continued

After considering a number of cases, he then concluded as to rights of negroes to ride on railroads without discrimination (109 U.S. 39, 3 S.Ct. 42, 27 L.Ed. 835):

"Such being the relations these corporations [operating] hold to the public, it would seem that the right of a colored person to use an improved public highway, upon the terms accorded to freemen of other races, is as fundamental in the state of freedom, established in this country, as are any of the rights which my brethren concede to be so far fundamental as to be deemed the essence of civil freedom. 'Personal liberty consists,' says Blackstone, 'in the power of locomotion, of changing situation, or removing one's person to whatever place one's own inclination may direct, without restraint, unless by due course of law.' But of what value is this right of locomotion, if it may be clogged by such burdens as congress intended by the act of 1875 to remove? They are burdens which lay at the very foundation of the institution of slavery as it once existed. They are not to be sustained, except upon the assumption that there is still, in this land of universal liberty, a class which may yet be discriminated against, even in respect of rights of a character so essential and so supreme, that, deprived of their enjoyment, in common with others, a freeman is not only branded as one inferior and infected, but, in the competitions of life, is robbed of some of the most necessary means of existence; and all this solely because they belong to a particular race which the nation has liberated. * * *"

See p. 39, supra.

Coming to the rights of a negro to accommodations in inns and taverns, the learned Justice pointed out (109 U.S. 40, 3 S.Ct. 42, 27 L.Ed. 835):

"As to inns. The same general observations which have been made as to railroads are applicable to inns. The word 'inn' has a technical legal signification. It means, in the act of 1875, just what it meant at common law. A mere private boarding house is not an inn, nor is its keeper subject to the responsibilities, or entitled to the privileges of a common innkeeper. 'To constitute one an innkeeper, within the legal force of that term, he must keep a house of entertainment or lodging for all travelers or wayfarers who might choose to accept the same, being of good character or conduct.' Redf. Carr. § 575. Says Judge Storey:

and 200, 11 L.Ed. 205, 213, 214, 215, 218, 222, 223, 224, 225 and 235; *Watson v. Jones*, 13 Wall. 679, 20 L.Ed. 666, (1872), in which case the majority of the Court discussed, 133 Wall. 714, 20 L.Ed. 670, fundamental principles of the Presbyterian teachings—and the effect of the Civil War which led to secession of one group who would not conform to what another group was teaching as the principles of that Church—caused by the abolition of slavery; *Rector,*

---

Note 20—Continued

" 'An innkeeper may be defined to be the keeper of a common inn for the lodging and entertainment of travelers and passengers, their horses and attendants. An innkeeper is bound to take in all travelers and way-faring persons, and to entertain them, if he can accommodate them, for a reasonable compensation; and he must guard their goods with proper diligence. * * * If an innkeeper improperly refuses to receive or provide for a guest, he is liable to be indicted therefor. * * * They [carriers of passengers] are no more at liberty to refuse a passenger, if they have sufficient room and accommodations, than an innkeeper is to refuse suitable room and accommodations to a guest.' Story, Bailm. §§ 475, 476.

"Said Mr. Justice Coleridge, in *Rex v. Ivens*, 7 Car. & P. 213 (32 E.C.L. 495):

" 'An indictment lies against an innkeeper who refuses to receive a guest, he having at the time room in his house; and either the price of the guest's entertainment being tendered to him, or such circumstances occurring as will dispense with that tender. This law is founded in good sense. The innkeeper is not to select his guests. He has no right to say to one, you shall come to my inn, and to another you shall not, as every one coming and conducting himself in a proper manner has a right to be received; and for this purpose innkeepers are a sort of public servants, they having in return a kind of privilege of entertaining travelers and supplying them with what they want.'

"These authorities are sufficient to show that a keeper of an inn is in the exercise of a quasi public employment. The law gives him special privileges, and he is charged with certain duties and responsibilities to the public. The public nature of his employment forbids him from discriminating against any person asking admission as a guest on account of the race or color of that person."
See Burton, supra, and Lombard.

Considering next the right of a negro to attend theatres, the dissent states (109 U.S. 41, 3 S.Ct. 43, 27 L.Ed. 835):

"As to places of public amusement. It may be argued that the managers of such places have no duties to perform with which the public are, in any legal sense, concerned, or with which the public have any right to interfere; and that the exclusion of a black man from a place of public amusement on account of his race, or the denial to him, on that ground, of equal accommodations at such places, violates no legal right for the

*etc. of Holy Trinity Church v. U. S.*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892) ; *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) in which case Mr. Justice Douglas, speaking for the majority, 343 U.S. 310 and 311, 72 S.Ct. 682, 96 L.Ed. 954 as did Mr. Justice Black dissenting, 343 U.S. 315, 317, 318 and 319, 72 S.Ct. 685 and 686, 96 L.Ed. 954 made references to "expressions of opinion from other than judicial sources"; like references

------

Note 20—Continued

vindication of which he may invoke the aid of the courts. *My answer to that argument is that places of public amusement, within the meaning of the act of 1875, are such as are established and maintained under direct license of the law.* The authority to establish and maintain them comes from the public. The colored race is a part of that public. The local government granting the license represents them as well as all other races within its jurisdiction. A license from the public to establish a place of public amusement, imports, in law, equality of right, at such places, among all the members of that public. This must be so, unless it be—which I deny—that the common municipal government of all the people may, in the exertion of its powers, conferred for the benefit of all, discriminate or authorize discrimination against a particular race, solely because of its former condition of servitude."

See *Watson v. Memphis.*

Mr. Justice Harlan points out (109 U.S. 42, 3 S.Ct. 44, 27 L.Ed. 835):

"*Congress has not, in these matters, entered the domain of state control and supervision.* It does not assume to prescribe the general conditions and limitations under which inns, public conveyances, and places of public amusement shall be conducted or managed. *It simply declares in effect that since the nation has established universal freedom in this country for all time, there shall be no discrimination, based merely upon race or color,* in respect of the legal rights in the accommodations and advantages of public conveyances, inns, and places of public amusement. (Emphasis supplied)

"I am of opinion that such discrimination is a badge of servitude, the imposition of which congress may prevent under its power, through appropriate legislation, to enforce the thirteenth amendment; and consequently, without reference to its enlarged power under the fourteenth amendment, the act of March 1, 1875, is not, in my judgment, repugnant to the constitution."

Reminding his fellow Justices of what had been previously decided in the Slaughter-house cases, he noted (109 U.S. 44, 3 S.Ct. 45, 27 L.Ed. 835):

"* * * this court, in the Slaughter-house Cases, declared that the one pervading purpose found in all the recent amendments, lying at the foundation of each, and without which none of them would have been suggested, was 'the freedom of the slave race, the security and firm estab-

are to be found in *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed. 393 (1961) and in *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). See also *Colorado Anti-Discrimination Com. v. Continental Air Lines, Inc.*, 372 U.S. 714, 83 S.Ct. 1022, 10 L.Ed.2d 84.

Since many of the references made in this opinion are from historical or sociological works, as well as of

---

Note 20—Continued

lishment of that freedom, and the protection of the newly-made freeman and citizen from the oppression of those who had formerly exercised unlimited dominion over him;' that each amendment was addressed primarily to the grievances of that race. * * *."

Mr. Justice Harlan took further occasion to call attention—(Id.):

"*It was adjudged in Strauder v .West Virginia and Ex parte Virginia, 100 U.S. 307, 345, and my brethren concede, that positive rights and privileges were intended to be secured, and are in fact secured, by the fourteenth amendment.*" (Emphasis supplied)

It is proper to here conclude by referring to what Mr. Justice Harlan said at a later point (109 U.S. 46, 3 S.Ct. 46, 27 L.Ed. 835):

"*The assumption that this amendment consists wholly of prohibitions upon state laws and state proceedings in hostility to its provisions, is unauthorized by its language. The first clause of the first section—'all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the state wherein they. reside'—is of a distinctly affirmative character. In its application* to the colored race, previously liberated, it created and granted, as well citizenship of the United States, as citizenship of the state in which they respectively resided. *It introduced all of that race, whose ancestors had been imported and sold as slaves, at once, into the political community known as the 'People of the United States.' They became, instantly, citizens of the United States, and of their respective states. Further, they were brought by this supreme act of the nation, within the direct operation of that provision of the constitution which declares that 'the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.'* Article 4, § 2.

"*The citizenship thus acquired by that race, in virtue of an affirmative grant by the nation, may be protected, not alone by the judicial branch of the government, but by congressional legislation of a primary direct character; this, because the power of congress is not restricted to the enforcement of prohibitions upon state laws or state action. It is, in terms distinct and positive, to enforce 'the provisions of this article' of amendment; not simply those of a prohibitive character, but the provisions,—all of the provisions,—affirmative and prohibitive, of the amendment.* It is, therefore, a grave misconception to suppose that the fifth section of the amendment has reference exclusively to express prohibitions

religious origin, it is proper to point out that Mr. Justice Douglas said in *Zorach v. Clauson*, 343 U.S. at 313, 72 S.Ct. at 684, 96 L.Ed. 954:

"We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of

---

Note 20—Continued

upon state laws or state action. *If any right was created by that amendment, the grant of power, through appropriate legislation, to enforce its provisions authorizes congress, by means of legislation operating throughout the entire Union, to guard, secure, and protect that right."* (Emphasis supplied)

It is worth while reading for every citizen of this great country—white as well as negro—to read, pause and consider this great dissent in its entirety. So much of what appears there is now recognized as the law of this land; yet it is tragic to consider the unfortunate consequences of the majority's then specific holding.

To date the Supreme Court has never specifically overruled its determinations because no question has been presented; Mr. Justice Bradley's opinion is frequently referred to as holding the 13th and 14th amendment prohibits discrimination by states. There is no reason it should have done so, but see *Shelly v. Kramer*, where the ruling in the Civil Rights case is referred to, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161.

In his concurring opinion in *Garner v. Louisiana*, 368 U.S. at 178, 82 S.Ct. 248, 259, 7 L.Ed.2d 207, Mr. Justice Douglas, cites the Civil Rights cases, and quoting from it, says:

"* * * The line of forbidden conduct marked by the Equal Protection Clause of the Fourteenth Amendment is crossed only when a State makes prejudice or intolerance its policy and enforces it, as held in the Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835. Mr. Justice Bradley, speaking for the Court, said: '* * * civil rights, such as are guaranteed by the constitution against state aggression, cannot be impaired by the wrongful acts of individuals, unsupported by state authority in the shape of laws, *customs*, or judicial or executive proceedings.' Id., at 17, 3 S.Ct. at 25. (Italics added.)"

Continuing, the learned Justice pointed out:

"State policy violative of the Fourteenth Amendment may be expressed in legislative enactments that permit or require segregation of the races in public places or public facilities (*Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873) or in residential areas. *Buchanan v. Warley*, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149.

government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual

---

Note 20—Continued

"It may be expressed through executive action, as where the police or other law enforcement officials act pursuant to, or under color of, state law. See, e.g., *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495; *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492.

"*It may be expressed through the administrative action of state agencies* in leasing public facilities. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45.

"It may result from judicial action, as where members of a race are systematically excluded from juries (*Hernandez v. State of Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866), or where restrictive covenants based on race are enforced by the judiciary (*Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586), or where a state court fines or imprisons a person for asserting his federal right to use the facilities of an interstate bus terminal, *Boynton v. Com. of Virginia,* 364 U.S. 454, 81 S.Ct. 182, 5 L.Ed.2d 206.

"As noted, Mr. Justice Bradley suggested in the Civil Rights Cases, supra, that state policy may be as effectively expressed in customs as in formal legislative, executive, or judicial action.

"It was indeed held in *Baldwin v. Morgan,* 5 Cir., 287 F.2d 750, 756, that the 'custom, practice and usage' of a city and its police in arresting four Negroes for using 'white' waiting rooms was state action in violation of the Fourteenth Amendment, even though no ordinance was promulgated and no order issued. * * *" (Emphasis supplied)

David Lawrence, Columnist[1], criticized President Kennedy's recent message to Council, citing the Civil Rights Cases, and the portion, 109 U.S. p. 19, 3 S.Ct. 27, 27 L.Ed. 835, wherein the majority said:

"* * * 'It is clear that the law question cannot be sustained by any grant of legislative power made to congress by the fourteenth amendment. * * * The law in question, without any reference to adverse state legislation on the subject, declares that all persons shall be entitled to equal accommodations and privileges of inns, public conveyances and places of public amusement, and imposes a penalty upon any individual who shall deny to any citizen such equal accommodations and privileges.

---

[1]New York Herald Tribune, June 21, 1963, page 19.

needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe. Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one. or some religion on any person. But we find no con-

---

" 'This is not corrective legislation: it is primary and direct; it takes immediate and absolute possession of the subject of the right of admission to inns, public conveyances, and places of amusement. It supersedes and displaces state legislation on the same subject, or only allows it permissive force. It ignores such legislation, and assumes that the matter is one that belongs to the domain of national regulation.

" 'Whether it would not have a more effective protection of the rights of citizens to have clothed congress with plenary power over the whole subject, is not now the question. What we have to decide is, whether such plenary power has been conferred upon congress by the fourteenth amendment, and, in our judgment, it has not.' "

We find, however, in the Supreme Court's recent rulings, especially those of May 20 and 29, 1963, that they throw a somewhat different light on Mr. Justice Bradley's language than he apparently meant in 1885. He said, it is to be remembered, Civil Rights Cases. 109 U.S. 11, 3 S.Ct. 21, 27 L.Ed. 835. "* * * Positive rights and privileges are undoubtedly secured by the fourteenth amendment; * * *" true "they are secured by way of prohibition against state laws and state proceedings affecting those rights and privileges * * *". On the other hand with the adoption of the Fourteenth Amendment Negroes were assured and guaranteed all the rights of citizenship, theretofore enjoyed by the white citizens notwithstanding the Dred Scott ruling. Whatever the Congress could and can now do for white citizens can be claimed by the Negro who have equal rights.

Mr. Lawrence takes issue with President Kennedy's request for legislation on the matter of equal employment rights and suggests:

"* * * 'the President is stepping on delicate ground when he insists that the Federal government can compel an employer to hire somebody to join a union. The President said:

" 'Denial of the right to work is unfair, regardless of its victim.' "

The Supreme Court upheld the constitutional power of Congress to legislate on the issues relating to Unions, although there were many who pointed to like "delicate" grounds as they affected rights of employers to hire whom they would, despite the demands of Union. Ultimately it is recognized that there is no great point of dispute; Unions can compel an employer to accept a person sent from the hiring hall or furnished by the Union, if the iontract so provides. Unions thereby received recognition

stitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence. * * *"

In the Girard Will case, supra as *Vidal v. Philadelphia*, Mr. Justice Story said (2 Howard 200, 11 L.Ed. 199) of an objection—that no clergyman of any sect was to hold office or exercise any duty in the then contemplated Girard College—

---

Note 20—Continued

on a Federal basis and by some state legislatures not theretofore accepted and the Congress can place conditions in Union legislation if it sees fit to do so.

While the Fourteenth Amendment may be applicable only to states, Negroes have rights as Federal citizens that can require Congress to act to protect such rights in the matter of employment opportunities.
See also the holding of the Supreme Court of the United States in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492. (1961) considering title 42 U.S.C.A. § 1983, which is the now effective Civil Rights legislation, giving only a right to maintain a civil action for damages where there is discrimination, Act of April 20, 1871, 17 S.Ct. 13. This case did not involve a negro nor was it premised on any criminal statute. The dissent of Mr. Justice Frankfurter, 365 U.S. 202, 81 S.Ct. 492, 5 L.Ed. 492, in *Monroe v. Pape*, has some interesting language for those concerned with the protection of civil rights and several references are made to the Civil Rights cases.

Considering our Inn Keeper's Law, in light of what was specifically held in the Civil Rights cases, it was undoubtedly not enforceable until late years, but certainly since *Lombardi v. Louisiana* no doubt can now exist as to its being not enforceable.

It is noteworthy to observe that the Supreme Court of Delaware has never definitely construed the Inn Keeper's Statute, 24 *Del. C.* § 1501, but it indicated in *Wilmington Parking Authority v. Burton*, supra, that the statute imposed no legal restraints upon the restaurant keeper. Said that Court, Del.Ch., 157 A.2d 894, at 902:

"It (Eagle Restaurant) acts as a restaurant keeper and, as such, is not required to serve any and all persons entering its place of business, any more than the operator of a book store, barber shop, or other retail business is required to sell its product to everyone. This is the common law, and the law of Delaware as restated in 24 *Del. C.* § 1501 with respect to restaurant keepers."

On certiorari, however, the United States Supreme Court concluded that state action was involved in the operation of the restaurant and that, therefore, it could not refuse to serve a man because of his race or color.

"* * * the objection itself assumes the proposition that Christianity is not to be taught, because ecclesiastics are not to be instructors or officers. But this is by no means a necessary or legitimate inference from the premises. Why may not a layman instruct in the general principles of Christianity as well as ecclesiastics? There is no restriction as to the religious opinions of the instructors and officers. They may be, and doubtless, under the

----

Note 20—Continued

It is to be recalled that in his concurring opinion in Burton, 365 U.S. 715, 81 S.Ct. 862, 6 L.Ed.2d 45, Mr. Justice Stewart said:

"* * * The highest court of Delaware has thus construed this legislative enactment (24 *Del. C.* § 1501) as authorizing discriminatory classification based exclusively on color. Such a law seems to me clearly violative of the Fourteenth Amendment."

In his dissenting opinion Mr. Justice Harlan, 365 U.S. 715, 81 S.Ct. 863, 6 L.Ed.2d 45, after first acknowledging that the Delaware statute as interpreted by Mr. Justice Stewart would indeed violate the Fourteenth Amendment, added:

"* * * If, on the other hand, the state court meant no more than that under the statute, as at common law, Eagle was free to serve only those whom it pleased, then, and only then, would the question of 'state action' be presented in full-blown form."

Concerning the differing views of his brother Judges, Mr. Justice Frankfurter said, 365 U.S. 715, 81 S.Ct. 864, 6 L.Ed.2d 45:

"* * * I certainly do not find the clarity that my brother Stewart finds in the views expressed by the Supreme Court of Delaware regarding 24 *Del. C.*, § 1501. *If I were forced to construe that court's construction, I should find the balance of considerations leading to the opposite conclusion from his, namely, that it was merely declaratory of the common law and did not give state sanction to refusing service to a person merely because he is colored.* The Court takes no position regarding the statutory meaning which divides my brothers Harlan and Stewart. *Clearly it does not take Mr. Justice Stewart's view of what the Supreme Court of Delaware decided.* If it did, it would undoubtedly take his easy route to decision and not reach the same result by its much more circuitous route." (Emphasis supplied)

Subsequent rulings by the United States Supreme Court, discussed supra at p. 321, have given a more logical—even a more intelligent meaning—to the majority opinion in Burton than was first given to it and the dissent in the Civil Rights cases. Intentionally or otherwise they have adopted a great part of what the former Mr. Justice Harlan said was "law" in 1885, and as he expressed his views, all noted above in the Civil Rights cases. It seems the rulings of the Supreme Court in late years have

auspices of the city government, they will always be, men, not only distinguished for learning and talents, but for piety and elevated virtue, and holy lives and characters. And we cannot overlook the blessings which such men by their conduct, as well as their instructions, may, nay must impart to their youthful pupils. Why may not the Bible, and especially the New Testament, without note or comment, be read and taught as a divine revelation in the college—its general precepts expounded, its evidences explained, and its glorious principles of morality inculcated? What is there to prevent a work, not sectarian, upon the general evidence of Christianity, from being read and taught in the college by lay teachers? Certainly there is nothing in the will that proscribes such studies. Above all, the testator positively enjoins, 'that all the instructors and teachers in the college shall take pains to instil into the minds of the scholars the purest principles of morality, so that on their entrance into active life they may from inclination and habit evince benevolence towards their fellow-creatures, and a love of truth, sobriety, and industry, adopting at the same time such religious tenets as their matured reason may enable them to prefer.' Now, it may well be asked, what is there in all this, which is positively enjoined, inconsistent with the spirit or truths of Christianity? Are not these truths all taught by Chris-

----

Note 20—Continued
followed the views of the majority in Burton but with effect given to what Mr. Justice Potter had said in Burton and what the former Mr. Justice Harlan had said in his dissent in the Civil Rights cases.

In light of the requirement for state action,—i.e. for obtaining a license to serve alcoholic liquors in Delaware—neither a licensee nor the Commission can now give any effect to the Inn Keeper's Law—such as by the refusal of a licensee to serve a drink at a bar or in a restaurant—or by "inaction" on the Commission's part in the enforcement of the rights of all citizens. Such conduct could lead to claims for damages in civil suits—brought in the Federal Courts under the Civil Rights Laws, Title 42, U.S.C.A. §§ 1983 and 1985, see dissent in *Williams v. Hot Shoppes, Inc.,* 110 U.S.App.D.C. 358, 293 F.2d 835 (1961).

tianity, although it teaches much more? Where can the purest principles of morality be learned so clearly or so perfectly as from the New Testament? Where are benevolence, the love of truth, sobriety, and industry, so powerfully and irresistibly inculcated as in the sacred volume? * * *."

Mr. Justice Brewer in the Rector of Holy Trinity Church case, supra, paused in his opinion, to call attention (143 U.S. 467, 12 S.Ct. 515, 36 L.Ed. 226):

"Coming nearer to the present time, the declaration of independence recognizes the presence of the Divine in human affairs in these words: 'We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness.' 'We, therefore, the Representatives of the United States of America, in General Congress, Assembled, appealing to the Supreme Judge of the world for the rectitude of our intentions, do, in the Name and by Authority of the good People of these Colonies, solemnly publish and declare,' etc.; 'And for the support of this Declaration, with a firm reliance on the Protection of Divine Providence, we mutually pledge to each other our Lives, our Fortunes, and our sacred Honor.'

"If we examine the constitutions of the various states, we find in them a constant recognition of religious obligations. Every constitution of every one of the 44 states contains language which, either directly or by clear implication, recognizes a profound reverence for religion, and an assumption that its influence in all human affairs is essential to the well-being of the community. * * *

"It may be only in the familiar requisition that all officers shall take an oath closing with the declaration, 'so help me God.' * * *

"There is no dissonance in these declarations. There is a universal language pervading them all, having one meaning. They affirm and reaffirm that this is a religious nation. These are not individual sayings, declarations of private persons. They are organic utterances. They speak the voice of the entire people. While because of a general recognition of this truth the question has seldom been presented to the courts, yet we find that in *Updegraph v. Com.*, 11 Serg. & R. 394, 400, it was decided that, 'Christianity, general Christianity, is, and always has been, a part of the common law of Pennsylvania; * * * not Christianity with an established church and tithes and spiritual courts, but Christianity with liberty of conscience to all men.' And in *People v. Ruggles,* 8 Johns. 290, 294, 295, Chancellor Kent, the great commentator on American law, speaking as chief justice of the supreme court of New York, said: 'The people of this state, in common with the people of this country, profess the general doctrines of Christianity as the rule of their faith and practice; and to scandalize the author of these doctrines is not only, in a religious point of view, extremely impious, but, even in respect to the obligations due to society, is a gross violation of decency and good order. * * * The free, equal, and undisturbed enjoyment of religious opinion, whatever it may be, and free and decent discussions on any religious subject, is granted and secured; but to revile, with malicious and blasphemous contempt, the religion professed by almost the whole community is an abuse of that right. Nor are we bound by any expressions in the constitution, as some have strangely supposed, either not to punish at all, or to punish indiscriminately the like attacks upon the religion of Mahomet or of the Grand Lama; and for this plain reason, that the case assumes that we are a Christian people, and the morality of the country is deeply ingrafted upon Christianity, and not

upon the doctrines or worship of those impostors.' And in the famous case of *Vidal v. Girard's Ex'rs.*, 2 How. 127, 198, this court, while sustaining the will of Mr.. Girard, with its provision for the creation of a college into which no minister should be permitted to enter, observed: 'It is also said, and truly, that the Christian religion is a part of the common law of Pennsylvania.' "

In the rulings made on Monday, June 17, 1963, in the Pennsylvania and Maryland Bible Reading cases, as such affects Public Schools, *Abington School District v. Murray v. Curlett*, 83 S.Ct. 1560, Mr. Justice Clark adhered to the oft stated expression of this being a religious nation and he said:

"Surely the place of the Bible as an instrument of religion cannot be gainsaid."

Necessarily that is a recognition of the religious influences in establishing and forming rights that are ultimately accepted to be and recognized as "legal rights".

It is believed the foregoing is adequate to explain and justify the many references made to religious opinions touching on the question for decision.

Legal scholars are also referred to Gray, The Nature and Sources of the Law, pages 287 and 302 et seq.; Pound's Readings on the History and System of the Common Law, pages 44 and 279; and Kohlers, Philosophy of Law, Chapter VI, pages 92 et seq., 222-223 and 250. Gray (Ibid) stated (page 287):

"I accept the question of Mr. Carter's: 'Whose notion of right and wrong was it?' as bringing matters to a test. We all agree that many cases should be decided by the courts on notions of right and wrong, and of course every one will agree that a judge is likely to share the notions

of right and wrong prevalent in the community in which he lives; but suppose in a case where there is nothing to guide him but notions of right and wrong, that his notions of right and wrong differ from those of the community,—which ought he to follow—his own notions, or the notions of the community? Mr. Carter's theory requires him to say that the judge must follow the notions of the community. I believe that he should follow his own notions."

Then at page 302 (Ibid):

"In organized communities, political or other, the courts, in laying down rules for the decision of cases, are hemmed in and limited in many ways; the duty and responsibility of considering what rules they ought to apply is largely taken away from them, and there is imposed upon them, or they impose upon themselves, by reason of statutes, precedents, professional opinion or custom, lines of conduct to be followed without regard to their moral character; but where these limitations have not been imposed, then it is safe to say that in all civilized societies the courts are impliedly directed to decide in accordance with the precepts of morality.

"Of course, I take morality in its largest sense, and mean by moral conduct, right conduct. In many, perhaps in most, of the questions, which are raised in the Law, morality presents itself in the guise of public policy. * * *."

Every citizen in this country must be aware of the part that religion played in forming the lines of thinking that eventuated into political views, then legal and constitutional rights respecting the issue of slavery and now the integration problems. See Balmes, supra, f. n. 50g; Weekes, Southern Quakery and Slavery; Friends in Wilmington, 1738-1938, published privately, Press of Chas.

L. Story Company, Wilmington, Delaware, see pages 75-86, considering and discussing the work of Thomas Garrett, the Quaker abolitionist; Chapter X, particularly page 216, Federal Street Pastor,[21] by Madelaine H. Rice, published 1960 by Bookman Associates; An Analysis of the Attitudes of American Catholics towards the Immigrants and the Negro, 1825-1925, by John C. Murphy, Catholic U. Press, Washington, D. C., 1940; Life of Charles Carroll of Carrolton,[22] 1898, G. P. Putnam, 2 Vols., 1898; American Catholic Opinion in the Slavery Controversy, Madelaine H. Rice, published 1944, Columbia U. Press, N. Y.; and Social Thought of American Catholics,[23] 1634-1829, by C. J. Nuesse, Westminster Press, 1945; see also Interracial News Service, March-April 1963 issue, Vol. 34, No. 2; The Andrean, June 9, 1963 issue, setting forth the letter of Rev. Martin Luther King, Jr.; and the statement by National Council of Churches, The Christian Century, June 19, 1963, page 797, on recent developments in the Integration Movement and referring to the moral aspects of the movement.

In the Papal Encyclicals, Divinum Illud, Pope Leo XIII; Rerum Novarum, Pope Leo XIII; Libertas Humana, Pope Leo XIII; Sapientiae Christianae, Pope Leo XIII; Quadragesimo Anno, Pope Pius XI; Fidei Donum, Pope Pius XII; Summi Pontificatus, Pope Pius XII; Mater et Magistra, Pope John XXIII; and Pacem In Terris, Pope John XXIII (April 11, 1963), the Popes exhorted all men

---

[21] This book has an excellent set of Notes and Bibliography, pages 303-345, pointing to the existence of other works and sources with references to the religious influences that gave force, form, meaning and substance to the Abolitionist Movement, especially the moral aspect thereof.

[22] While a Senator in the General Assembly of Maryland Mr. Carroll initiated legislation for the abolition of slavery in Maryland.

[23] At page 261, reference is made to the work of Father John Thayer, a Missionary Priest who worked in Virginia and Kentucky, Mission Country, and who preached actively and in support of the movement to abolish slavery.

to live charitably toward their brethren in all the world, with recognition of mutual rights and respect for human dignity.

For instance, in Pacem In Terris, the late Pope John XXIII—whose death now is mourned by all—stated:

### "ORDER BETWEEN MEN
### "EVERY MAN IS A PERSON WITH RIGHTS AND DUTIES

"First of all, it is necessary to speak of the order which should exist between men. Any human society, if it is to be well ordered and productive, must lay down as a foundation this principle, namely, that every human being is a person, that is, his nature is endowed with intelligence and free will. By virtue of this, he has rights and duties of his own, flowing directly and simultaneously from his very nature, which are therefore universal, inviolable and inalienable.

"If we look upon the dignity of the human person in the light of divinely revealed truth, we cannot help but esteem it far more highly. For men are redeemed by the blood of Jesus Christ. They are by grace the children and friends of God and heirs of eternal glory.

### "RIGHTS
### "THE RIGHT TO LIFE AND A WORTHY STANDARD OF LIVING

"Beginning our discussion of the rights of man, we see that every man has the right to life, to bodily integrity, and to the means which are necessary and suitable for the proper development of life. These are primarily food, clothing, shelter, rest, medical care, and finally the necessary social services. Therefore a human being also has the right to security in cases of sickness, inability to work,

widowhood, old age, unemployment, or in any other case in which he is deprived of the means of subsistence through no fault of his own.

## "RIGHTS PERTAINING TO MORAL AND CULTURAL VALUES

"By the natural law every human being has the right to respect for his person, to his good reputation; the right to freedom in searching for truth and in expressing and communicating his opinions, and in pursuit of art, within the limits laid down by the moral order and the common good; and he has the right to be informed truthfully about public events.

"The natural law also gives man the right to share in the benefits of culture, and therefore the right to a basic education and to technical and professional training in keeping with the stage of educational development in the country to which he belongs. Every effort should be made to ensure that persons be enabled, on the basis of merit, to go on to higher studies, so that, as far as possible, they may occupy posts and take on responsibilities in human society in accordance with their natural gifts and the skills they have acquired."

In a later part, he emphasized:

## "RESPONSIBILITIES OF THE PUBLIC AUTHORITY AND RIGHTS AND DUTIES OF INDIVIDUALS

"It is agreed that in our time the common good is chiefly guaranteed when personal rights and duties are maintained. The chief concern of civil authorities must therefore be to ensure that these rights are acknowledged, respected, coordinated with other rights, defended and promoted, so that in this way each one may more easily carry out his duties. For 'to safeguard the inviolable

rights of the human person, and to facilitate the fulfillment of his duties, should be the essential office of every public authority.'

"This means that if any government does not acknowledge the rights of man or violates them, it not only fails in its duty, but its orders completely lack juridical force."

Then this statement is to be found:

## "LAW AND CONSCIENCE

"It is unquestionable that a legal structure in conformity with the moral order and corresponding to the level of development of the political community is of great advantage to achievement of the common good.

"And yet, social life in the modern world is so varied, complex and dynamic that even a juridical structure which has been prudently and thoughtfully established is always inadequate for the needs of society.

"It is also true that the relations of citizens with each other, of citizens and intermediate groups with public authorities, and finally of the public authorities with one another are often so complex and so sensitive that they cannot be regulated by inflexible legal provisions. Such a situation therefore demands that the civil authorities have clear ideas about the nature and extent of their official duties if they wish to maintain the existing juridical structure in its basic elements and principles, and at the same time meet the exigencies of social life, adapting their legislation to the changing social scene and solving new problems. They must be men of great equilibrium and integrity, competent and courageous enough to see at once what the situation requires and to take necessary action quickly and effectively."

As if he was concerned with the very issue under discussion, the late and revered Holy Father observed:

## "THE TREATMENT OF MINORITIES

"Since the 19th century there has been a rather widespread tendency in historical evolution for political communities to equate themselves with national communities. For various reasons, however, it has not always been possible to make geographical boundaries coincide with ethnic ones. This gives rise to the phenomenon of minorities and to the relative complex problems.

"In the first place, it must be made clear that justice is seriously violated by whatever is done to limit the strength and numerical increase of these minority peoples. The injustice is even more serious if such sinful projects are aimed at the very extinction of these groups.

"On the other hand, the demands of justice are admirably observed by those civil authorities who promote the natural betterment of those citizens belonging to a smaller ethnic group, particularly when that betterment concerns their language, the development of their natural gifts, their ancestral customs, and their accomplishments and endeavors in the economic order.

"It should be noted, however, that these minority groups, either because of a reaction to their present situation or because of their historical difficultues, are often inclined to exalt beyond due measure anything proper to their own people, so as to place them even above human values, as if that which is proper to humanity were to be at the service of that which is proper to the nation.

"Reason rather demands that these very people recognize also the advantages that accrue to them from their peculiar circumstances. For instance, no small contribution is made toward the development of their particular talents and spirit by their daily dealings with people who have grown up in a different culture. This, however, will

be true only if they will know how to act as a bridge, which facilitates the circulation of life in its various expressions among different traditions or civilizations, and not a zone of discord which can cause great damage and choke natural development."

Outstanding religious figures have in the past and in recent weeks spoken out on these social questions, including those under consideration—see Statement of the Presiding Bishop of the Protestant Episcopal Church in the U. S. A.; the statement by Reverend David Ellwanger, a white pastor of an all negro Missouri Synod Church (June 10, 1963); the Pastoral Letter sent to all Episcopalians in the Diocese of Delaware by Bishop J. Brooke Mosley; the statement by the Roman Catholic Bishop of the Diocese of Wilmington (May 8, 1963) and the pronouncements on pages 9, 13, supra, are to be examined.

I note particularly Bishop Lichtenberger's statement:

"Our Church's position on racial inclusiveness within its own body and its responsibility for racial justice in society has been made clear on many occasions by the General Convention. But *there is urgent need to demonstrate by specific actions what God has laid on us*. Such actions must move beyond expressions of corporate penitence for our failures to an unmistakable identification of the Church, at all levels of its life, with those who are victims of oppression.

"I think of the words we sing as we hail the ascended Christ, 'Lord and the ruler of all men', and of our prayers at Whitsuntide as we ask God to work His will in us through his Holy Spirit. And then in contrast to our praises and our prayers our failure to put ourselves at the disposal of the Holy Spirit becomes painfully clear. *Only as we take every step possible to join with each other*

*across lines of racial separation in a common struggle for justice will our unity in the Spirit become a present reality.*

"*It is not enough for the Church to exhort men to be good.* Men, women and children are today risking their livelihood and their lives in protesting for their rights. *We must support and strengthen their protest in every way possible, rather than give support to the forces of resistance by our silence.* \* \* \*." (Emphasis supplied)

Bishop Hyle, Bishop of the Roman Catholic Diocese of Wilmington, said on May 8, 1963:

"The Public Accommodations Law recommended by the State Human Relations Commission is designed to correct current abuses under which fellow citizens and foreign visitors are exposed to mistreatment, inconvenience, restrictions, and suffering simply because of their color or racial background. Such legislation should not be necessary in a country that claims to be Christian and proclaims that all men are created equal. But unfortunately many are blinded by inherited prejudices and by misunderstanding of the basic justice due from one human being to another. That is why such legislation is now necessary as enlightened men realize the injustice and unfairness of present practices. Let us hope then that Delaware, the First State of the Union, will not be the last one to uphold the Declaration of Independence, by adopting this needed law." (Emphasis supplied)

Bishop J. Brooke Mosely has recently written to the people of his Diocese:

"\* \* \* some folks believe that the Episcopal Church's stand in Delaware on this issue is largely the reflection of my own opinions or the opinions of our stronger clergy and laymen, as if a few of us were riding a hobby or indulging our personal idiosyncrasies. But please, good peo-

ple, at this critical time in our history when we are racked by racial turmoil, do remember that the Episcopal Church's position in these matters is not determined by anyone's hobbies or personal idiosyncrasies but rather by our General Conventions, Lambeth Conferences, Anglican Congresses, Diocesan Conventions, and every similar group where the 'official mind' of the Episcopal Church can be expressed. And whenever it speaks it says something like this:

" 'We believe in the natural dignity and value of every man, of whatever color or race, as created in the image of God and as one for whom Christ died;

that discrimination by reason of color or race between men has as its root human sin;

that *we call first upon our fellow churchmen by God's Grace to cleanse themselves of all spirit of racial discrimination; and then upon all persons,* especially the members of our Church, *to work together in charity and forbearance, toward the establishment, without racial discrimination, of full opportunities in fields such as education, housing, employment and public accommodations.' "*
(Emphasis supplied)

The article in Christian Century, supra, quotes from addresses recently at a dinner in Riverside Church, New York, where Rev. Roy G. Ross, General Secretary of the National Council of Churches, stated in his address:

"* * *. Dr. Ross called the National Council 'a means for arousing a public conscience, feeding the hungry, giving guidance to people who have been misguided by their prejudices and helping to build a wholesome society.' "

The Rev. David Ellwanger is quoted as having said:

"Mr. Campbell states that because the three girls did not partake of Holy Communion they are guilty of hypoc-

risy. This may be. But I am sure they were not the only hypocrites in the church—if they were hypocrites. Really *no one knows the reason why these girls did not partake of the Lord's Supper—except God himself.* * * *. *Of more grave concern to the thinking Christian is the conclusion in the Campbell commentary that 'it is still a man's personal privilege to choose those with whom he will worship.' This is a very common view of the Church. But it is not Christ's view. This is the view of the Church that makes it a theological country club* * * * *and if the non-member doesn't have the right kind of clothes, doesn't live on the right side of the tracks, doesn't have the right accent, doesn't have the right color, then he isn't acceptable.* * * *. One does not have to be a seminary graduate to see the main message of Scripture * * *. Jealousy, envy, wars, class hatred, racial discrimination are all symptoms of the tragic rebellion of man against God and man against man." (Emphasis supplied)

Perhaps the excerpts from the strong statement set out in the above noted issue of *Interracial News Service* must be set out:

"The race problem is, too, emotional and controversial. Controversy frightens people. They would like to evade or postpone its heat and embarrassment. They would like to avoid its danger of arousing extremist elements and adamant view points. The emotional quality of racial discussion in our country intimidates thoughtful people. This is another reason why leaders must insist upon assertive and authoritative campaigns that address the issues and reject postponement.

"In our society, in which life is so complex, it is now evident that the outer works of segregation extend far. The racial restrictions of the suburbs and the upper echelons of social power are protected and abetted by the ex-

ploitation and the subculture of poverty in which people of color are caught. Desegregation is not practicable for minority families so heavily afflicted by unemployment, educational lag and disorganization in our ghetto areas.

"Again, if there is one lesson that the study of race relations and civil rights advances in American life teaches, it is that gains have been made, not by reliance upon benevolence and happy evolution, but by reliance upon pressure, protest and aggressive action. This may be a sad commentary on moral suasion as a method of social change and upon the moral responsiveness of our people, but it is to me utterly clear from a reading of the course of race relations improvement. Hence, in America to the victor belongs the toils. To achieve victory in racial situations requires the most intensive kind of social drive and a regimen of vigor."

On Memorial Day, 1963, Vice President Lyndon B. Johnson, Chairman of the President's Committee on Equal Employment Opportunity, spoke at Gettysburg, Pa., where President Lincoln delivered his immortal Gettysburg Address 100 years ago. At one point in his Address, he said:

"As we maintain the vigil of peace, we must remember that justice is a vigil, too—a vigil we must keep in our own streets and schools and among the lives of all our people—so that those who died here on their native soil shall not have died in vain.

"One hundred years ago, the slave was freed.

"One hundred years later, the Negro remains in bondage to the color of his skin.

"The Negro today asks justice.

"We do not answer him—we do not answer those who lie beneath this soil—when we reply to the Negro by asking, 'Patience'.

"It is empty to plead that the solution to the dilemmas of the present rests on the hands of the clock. The solution is in our hands. Unless we are willing to yield up our destiny of greatness among the civilizations of history, Americans—white and Negro together—must be about the business of resolving the challenge which confronts us now.

"Our nation found its soul in honor on these fields of Gettysburg one hundred years ago. We must not lose that soul in dishonor now on the fields of hate.

"*To ask for patience from the Negro is to ask him to give more of what he has already given enough. But to fail to ask him—and of all Americans—perseverance within the processes of a free and responsible society would be to fail to ask what the national interest requires of all its citizens.*

"*The law cannot save those who deny it but neither can the law serve any who do not use it.* The history of injustice and inequality is a history of disuse of the law. Law has not failed—and is not failing. *We as a nation have failed ourselves by not trusting the law and by not using the law to gain sooner the ends of justice which law alone serves.*" (Emphasis supplied)

Vice President Johnson's concluding words must be heeded:

"In this hour, it is not our respective races which are at stake—it is our nation. Let those who care for their country come forward, North and South, white and Negro, to lead the way through this moment of challenge and decision.

"The Negro says, 'Now.' Others say, 'Never.' The voice of responsible Americans—the voice of those who died here and the great man who spoke here—their voices say, 'Together.' There is no other way.

*"Until justice is blind to color, until education is unaware of race, until opportunity is unconcerned with the color of men's skins, emancipation will be a proclamation but not a fact. To the extent that the proclamation of emancipation is not fulfilled in fact, to that extent we shall have fallen short of assuring freedom to the free."* (Emphasis supplied)

When he was given a Distinguished Service Award at the Capital Press Club on May 18, 1963, Vice President Lyndon B. Johnson—who, it is to be remembered, is a Texan—said, in part:

"I am very proud—and I do not apologize for my pride—that you have included me in the company of those who are being honored tonight. At the same time, however, I am aware that this dinner does not represent the last chapter in a book or even the last page of a chapter. *When we are involved in the field of human rights, we cannot consider the volume closed until those rights are so secure that no one even thinks of challenging them.*

"At this moment in the history of our country, it is possible to call a roll of successful achievements in the struggle for equality of opportunity and human understanding. That roll can and should be called frequently because it is essential in times of strife and turmoil to remind ourselves that progress *is* possible and our goals some day *will* be achieved—if we have sufficient dedication.

"But we would be doing ourselves and our country a disservice if we assumed that those successes meant that

full and complete justice has been achieved. Quite the contrary! *Justice is not a partial thing which can be measured in terms of percentages. Any degree of injustice is complete injustice. And until we achieve complete justice, we can regard progress only as a series of steps towards the goal. Each step should hearten us; but should not lull us into self-satisfaction that the job has been done."* (Emphasis supplied)

Referring to an announcement that was intended to show the great improvements in race relations and particularly in employment practices, Vice President Johnson made a comment of an editorial written by a Negro editor of a paper whose circulation is primarily among Negroes. The editor, notes Vice President Johnson, "said something like this:

" 'When somebody points out how far I have come I am the ungrateful kind of SOB who points out how far he has got to go.'

"Some people considered the comment to be ungracious—and perhaps it was. But that point did not bother me. The thought that loomed largest in my mind was that the comment was *valid*—and that the editor was absolutely right!

"A massive Federal effort, backed by all the prestige of the executive agencies of the government, had succeeded only in bringing the editor (speaking figuratively) part way along the road to a goal where he had a *right*, as a human being, to be without any federal effort at all.

*"This is a sobering thought which I commend to those of my fellow Americans who sometimes feel that efforts at progress should be abandoned because the presumed beneficiaries of these efforts do not express deep gratitude.*

*"The truth of the matter is that there is nothing to be grateful for—except, perhaps, the discovery that decades of inequality have not succeeded in quenching the flame of conscience in the breast of our fellow man.*

"We are trying to 'do something' for a group of people that will give them an extra edge in life. All we are trying to do is to eliminate deprivation so this group will have an opportunity to compete with their fellow Americans on terms of equality. And should we succeed, I am confident that they will take care of themselves—as they want to any way." (Emphasis supplied)

Vice President Johnson later made these observations:

"As a prudent (at least, I hope I am prudent) man, I know that frequently in life I have had to settle for progress short of perfection. I have done so because—despite cynics—I believe that half a loaf *is* better than none. But *my acceptance has always been conditioned upon the premise that the half-loaf is a step towards the full loaf—and that if I go on working, the day of the full loaf will come.*

*"It seems to me that in the field of human rights, we are well past the stage where half a loaf will do.* No one in this audience is so unrealistic as to expect to awake tomorrow morning in a perfect world. But, nevertheless, progress must come faster and I believe it will come faster as sensible men and women realize that they cannot afford—morally or economically—to abandon the field to the forces of unreason.

"Progress must come faster because otherwise there are millions of individuals—human beings entitled to their rights—who will never receive justice even though some day justice may come to their group.

"Progress must come faster because otherwise the tragic headlines which speak of the breakdown of law and order will increase rather than diminish. (And I hope we relearn the lesson that issues which are not settled by justice and fair play will sooner or later be settled by force and violence).

"Progress must come faster because otherwise we will not achieve the unity which we must have if freedom —freedom for all of us—is to survive.

"And, finally, progress must come faster simply because it is right—and has been too long delayed.

"*I think that one of the greatest barriers to progress is the fact that we don't talk to each other enough—or rather that we don't listen to each other enough with an understanding ear. We leap to conclusions too rapidly; we seize upon half truths without looking at the full picture; we accept slogans without looking behind those slogans to the essential reality.*

"For example, it is said repeatedly that no law can enforce human understanding or implant reasonable attitudes among human beings. With this statement, I agree. It is valid. It is also beside the point and totally irrelevant to the issues that divide our country today.

"*The law cannot bring reasonable men and women together to work out their differences. But it can restrain unreasonable men and women from imposing their will on a community—and then the reasonable people can, and will, get together and work out their problems themselves.*

"*The law cannot inject goodness and brotherhood into those who are determined to reject both qualities. But it can prevent the extremists from trampling over the rights of others.*

*"The law cannot 'make men equal' and does not pretend to do so. But it can open the doors of equal opportunity which have been slammed shut by those who fear that when men and women can compete on an equal basis and are equal before the law, they will turn out to be rather equal after all."* (Emphasis supplied)

■ The closing note of Vice President Johnson's is most apposite to the problem which faced the Court in this case—a problem which had to be solved by a holding that the white licensees of the Commission can no longer serve just those whom they choose to serve—a holding that the Commission cannot sit by idly and permit such licensees to serve just those whom they choose to serve. Since the sale of alcoholic liquors in this state is based "on state action", no citizen of this state can be denied equal protection of the laws of this state. Vice President Johnson's words were:

"I only wish to leave you with one thought. These are difficult, emotion-ridden times. We face strife—and it is idle to pretend that it will go away. It is going to be difficult to maintain our perspective—at times virtually impossible.

"Yet, this we must do.

"We must remember that we are all Americans— Americans with a difficult problem. We must work it out together. We must not be satisfied just with 'progress' but neither can we afford to despair and reject progress.

"I have faith that the day will come when it is not necessary nor remarkable to give or receive human rights awards—not necessary or remarkable simply because justice will be colorblind and all men and women will be judged on their merits and not on irrelevant considerations of ancestry."

The Vice President in his two talks made references to the strife and violence that at present faces all of us.

I venture the comment that this seems to be the way ends have been achieved in the history of America. I have noted herein, supra, 50a, the struggles following our American Revolution, and the adoption of our present Constitution—even the disorders in some areas resulting from strikes. Many of those presently alive can and should remember what happened in many places in this country as a consequence of the Depression of 1929-1934, including the adoption of certain provisions of the National Recovery Act of 1934, 48 Stat. 195 and when the Warner Act went into effect, following congressional enactment. Citizens will give vent to their feelings to frustration and disappointment; the First Amendment to the Federal Constitution gives them the right to express such feelings—but by peaceful means. It is not to be forgotten that the United States Supreme Court recently refused to review a State Court decision enjoining disorder by Negroes whose conduct had become violent. That should not be a surprise. On the other hand, those who "picket" to obtain their rights should not be exposed to the "Bull Connors", his fire hoses or his dogs.

In bringing this already all too long opinion to a close it seems appropriate to refer to some Biblical admonitions,—to the obligations imposed on all mankind by the Great Master, see Gospel of St. Matthew, Ch. 25, verses 31-46; Gospel of St. Matthew, Ch. 28, verses 18-20; First Epistle of St. John, Ch. 3, verses 17-18; and Epistle of St. John, Ch. 4, verses 8-21. Further and other Biblical citations can be found but those given above point out the problem presented to those who profess Christianity as their mode of life; they suffice to note what God has revealed, indicating what He expects of those who are his followers.

The note struck by former Bishop McKinstry, of the Protestant Episcopal Diocese of Delaware in the Invocation he made on the occasion of the Dinner tendered Former Chief Justice Southerland, on the occasion of his retirement as Chief Justice of this State, must find appeal in the hearts of every member of our Judiciary, as well as of the Bar of this State. Bishop McKinstry expressed himself:

"O Almighty God, Thou Source of All Moral law, Order and justice, we thank thee that in this critical period in our nation's history; when our unity, progress and internal peace are threatened daily in so many ways— Thou dost raise up men of deep integrity and enlightened wisdom—to preside over and to practice in the courts of our State and Nation. Thou, O God, hast made it abundantly clear that there can be no internal peace or unity in our land unless these be founded on justice; that there can be no justice unless men of integrity and good will acknowledge the moral authority of The Infinite One; no human progress—without the wise and impartial interpretation of the law of the land. And so tonight, O God— on behalf of all our citizenry accept the thanks of thy people for all those who have given of themselves and their talents, in the pursuit of justice for all; especially Thy Servant whom we greatly desire to honor this day. And grant to all who continue to serve in our courts, in his illustrious tradition—clear vision, true judgment and selflessness, that when their work is done—they, too, may be permitted a lasting place in the hearts and affections of their fellowmen. All this—we ask in Thy Holy name. Amen."

*Turner v. Memphis,* 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962) was cited in the May 20, 1963 opin-

ions.[24] The case involved a Tennessee Statute, authorizing a state official to issue "rules and regulations * * * as may be necessary pertaining to the safety and/or sanitation of hotels and restaurants", and providing "violations of such regulations" to be a misdemeanor.

The designated state official, under color of the statute, promulgated a regulation requiring segregation of the races in hotels, motels and restaurants. A suit was brought, seeking a declaratory judgment of the validity of the regulation.

The Supreme Court of the United States ruled: (369 U.S. 350, 353, 82 S.Ct. 805, 806, 7 L.Ed.2d 762)

"* * * Since, * * *, the Dobbs Houses restaurant was subject to the strictures of the Fourteenth Amendment under *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45, the statutes and regulation invoked by appellees could have furnished a defense to the action only insofar as they expressed an affirmative state policy fostering segregation in publicly operated facilities. But our decisions have foreclosed any possible contention that such a statute or regulations may stand consistently with the Fourteenth Amendment. * * *" *Brown v. Kansas*, supra, and other cases were cited as supporting the ruling.

Hence, if in a restaurant or hotel—operated pursuant to "public authorization or license"—discrimination is sought to be practiced or based on possible "health regulations", it is clear now this is beyond the pale, if the licensed place is obliged to base the policy of operation of its business on racial factors.

 It clearly appears from the foregoing review of the U. S. Supreme Court cases that no doubt can now

___

[24]See page 40 supra.

exist as to the enforcement of constitutional rights—by means of equal protection of the laws—they cannot involve any state action, whether based on Constitution, Statute, Administrative Actions or Rulings, Police Command, or even in the enforcement of Criminal Measures, if premised on racial differences alone. The states, and that includes any of its agencies or political subdivisions, may not act or leave undone or, by "inaction" deny the equal protection of the laws to any citizen if the basis of the action or inaction is the color or race of the citizen. This includes a grant or the use of licenses granted pursuant to law.

▇▇▇ No longer can this state enforce the Inn Keepers' Law 24 *Del. C.* § 1501—by any court process—if the basis of enforcement is the color or race of any citizen. When and if a case arises where the conduct of a citizen is "objectional" because of his conduct another and different question will arise and will be treated as the facts require.

It may not be necessary now to say so, but clearly this would include enforcement of any trespass action, or by one seeking comparable relief, at the behest of a person who is licensed by a state or a subdivision thereof, under the police power, to operate a hotel, motel or restaurant. It is now crystal clear that no State Courts can lend any aid to any attempt to enforce any public or private right—if the basis of the effort to protect the asserted rights interferes with any citizen's constitutional right of equal protection of the laws; this includes public action or inaction by a state or by one of its agencies or subdivisions. The United States Supreme Court has closed all avenues along these highways and the State Courts must follow the rulings of the United States Supreme Court in these constitutional areas.

I am well aware that the U. S. Supreme Court in its rulings of May 20, 1963 preserved to individuals the full protection of the law—if his "home or yard or farm or garden" is involved; such person can "seek and obtain the aid of the State against the intruder". See concurring opinion of Mr. Justice Douglas in *Lombard, et. al. v. Louisiana,* supra, and the dissent of Mr. Justice Harlan, 373 U.S. 244, 83 S.Ct. at 1133, 10 L.Ed.2d 338, in this and the related cases.

At the risk of still further lengthening this now already too extensive opinion, it seem appropriate to set out, in part, what Richard Wilson, a nationally known journalist, has said—in laymen's language—of the May 20, 1963 rulings [Phila. Bulletin, May 27, 1963, p. 17] as they seem in his eyes to affect Civil Rights:

"After about 20 years of turbulent step-by-step progress toward race equality, the point has now been reached where the morality of personal choice comes stronger into question.

\* \* \* \* \* \*

"For more than 25 years, beginning in 1938, the courts have been ordering the elimination of segregation in public facilities, most notably in the public schools, but also in transportation, and to a lesser degree in housing and on public golf courses, beaches, swimming pools, libraries and amusement parks.

"The major emphasis—in fact, it may be said the only legal emphasis—in this field has been on the equal use and benefits of public facilities.

\* \* \* \* \* \*

"We find now, as a result of the Supreme Court's ruling in the sit-in demonstration cases [May 20, 1963]

the introduction of a newer element which has been implicitly present all the time but not so strongly brought forward.

"This is the question of private segregation.

"A great many individuals claim the right to conduct their lives in their own way and in the tradition of the English common law. They claim this right in their homes, their churches, their means of making a livelihood and other phases of their lives which need not be directly involved with the state.

 &ast; &ast; &ast; &ast; &ast; &ast;

"Individualism takes myriad forms, ranging from the illegal to the merely eccentric and up to the sublime. But it is an established way of life much prized by its practitioners and hard to eradicate even in an era of conformism. Hardly anyone escapes a certain taint of individualism.

"There are some, probably millions, who wish to practice private segregation by belonging to clubs, and going to or operating restaurants, stores, churches, theaters and social assemblies where they are not any Negroes. This may be a misguided and reprehensible way of life but it is not one[25] which is prohibited by the 14th Amendment to the Constitution of the United States, as currently interpreted.

"Whether or not this will continue to be wholly the case is the question.

"In the rulings freeing some 40 sit-ins demonstrators, the Supreme Court came to the fringes of the question.

---

[25]This is not true legally speaking if the license to operate is based on public law relating to the exercise of the police power.

These rulings were based on the illegality of attempting to enforce segregation laws which are unconstitutional.

\* \* \* \* \* \*

"Left open was the question of whether a storekeeper or restaurant operator can of his free choice conduct his own private segregation unaffected by law. If he cannot, then there will have been a moral breakthrough which in due time would undoubtedly have a wider ranging effect. The court will have an opportunity in the near future to rule more narrowly on this question in a Maryland case which has been assigned for reargument.

"It may well be that the very nature of operating a business which caters to the general public will be found to be so affected by the interests of the state that it must be open to all, white and Negro. The fact that such a business abuts a public street or must get public licenses of one form or another may be found to invest it with the character of a public facility.

\* \* \* \* \* \*

"In view of these trends of thought, the observations of the court's lone dissenter, Justice Harlan [referred to above] are worthy of long consideration. He said:

" 'An individual's right to restrict the use of his property, however unregenerate a particular exercise of that right may be thought, lies beyond the reach of the 14th Amendment.

" 'Freedom of the individual to choose his associates or his neighbors; to use and dispose of his property as he sees fit; to be irrational, arbitrary, capricious, even un-

just in his personal relations are things all entitled to a large measure of protection from government interference.' "[26]

It is now believed that the doubt expressed and the question posed by the Chairman of the Commission, supra, at page 26, have been fully answered and the future course of the Commission made clear.

 It has the rule making power, 4 *Del. C.*, §§ 304, 309 and 581(c) to lend support to enforcement of its obligations and enable it to require its licensees to abide by the laws of this state and of the United States— if the Commission sees fit to utilize such power.

 It is not for this Court to suggest what rule the Commission may or should adopt; its duty is now clear and as intelligent and right meaning citizens the Court realizes and ventures the thought the Commission now knows what it must do to see to it that its licensees can no longer deny equal protection of the law to all citizens of the state, if in seeking to do so, they would prefer the color or race of one group of citizens over another or other group of citizens. Their right to hold licenses can be put in jeopardy if they insist on doing so.

 From the foregoing it is clear now that this Court is not bound by the Commission's ruling on Appellant's applications. Its rulings were based on or were made as a consequence of "errors of law" and under 4 *Del. C.* § 541(c) the Court, by legislative authorization and direction is empowered to set aside such findings and disregard the conclusions; it has been given the power to "render an appropriate judgment". See *Wilmington Country Club v. Commission,* supra.

---

[26]It is to be noticed that the learned Justice makes no reference to places where the public is expected and the grant of a license is a prerequisite to operation.

■ At first blush this seems to be an usurpation by the Court of powers given, in the first instance, to the Commission, 4 *Del. C.* § 511 et seq. and § 541, and a failure to recognize the division of governmental powers, as set forth in our State Constitution. It is, however, wholly constitutional, since the ruling of the Supreme Court in *State ex rel. Craven v. Schorr,* and the related cases (1957), 11 Terry 365, 370, 131 A.2d 158, 161, relative to the "reservoir" of power of the General Assembly— upholding long standing constitutional principles—which includes the power of the General Assembly to place the exercise of the several powers of Government where it will, and so giving the right to our courts to act as the General Assembly directs. The Supreme Court said (Id.):

"* * * that 'absent a constitutional inhibition, the power of the legislature as the repository of the legislative power with its broad and ample sweep, has full and unrestrained authority to exercise its discretion in any manner it sees fit in its wisdom or even folly to adopt'. *Collison v. State ex rel. Green,* 39 Del. 460, 2 A.2d 97, 101, [, 119 A.L.R. 1422]."

As a matter of legal and historical interest,[27] it is to be noted the Courts have, 1915 Rev.C., Chap. 6, Article 11, §§ 153-166, and prior thereto, long supervised the grant or refusal of licenses to sell alcoholic liquors, on and off the premises. See 1915 Rev.C., §161. That section of our law, effective dating back to 1873 and until the advent of Prohibition in 1919, directed how licenses were to be granted and how the business of such sales of alcoholic liquors was to be carried on, whether for "on" or "off" premises consumption. The law was enacted 14

[27]See discussion in footnote 13, supra p. 314, of Colonial regulation of Inn Keepers and statements appearing in opinion of Mr. Justice Douglas, supra at p. 324.

*Del. L.* Ch. 418 and approved April 10, 1873. Hence I find and concede now that there is no legal obstacle to this Court rendering what it conceives is the proper judgment as now called for and as authorized by statute, 4 *Del. C.* § 541(c).

What is the "appropriate judgment" the Court should render? This question has already been decided by this Court, in an opinion by our then President Judge, and now the present Chief Justice of the Supreme Court, see *Wilmington Country Club. v. Commission,* supra.

The Commission's investigative personnel, when testifying before this Court, noted and the Court found, supra pages 6, et seq., the existence of ample reasons to grant an additional licensed establishment for sale of alcoholic liquors, "on" or "off" the premises.

The Commission has contended the Court should limit its judgment in the issuance of a license to licensing the place as one where alcoholic liquors are to be consumed "on the premises" but the Commission's records, supra page 7, show that the three present licensees for consumption "off" the premises make sales in "a very substantial excess * * * in comparison with sales of such licensees elsewhere * * *". This indicates there is the demand and the Commission should ever be cautious in granting a monopoly or monopolies. No adequate showing has been made that Appellant should be limited to an "on" premises license in light of the facts shown, so the judgment of the Court is that the Commission should issue to Appellant the licenses sought.

An order will be entered carrying into effect the determinations, rulings and judgment of the Court, directing the issuance of the licenses to the Appellant and as-

sessing the costs in this Court in the sum of $70.52 on the Delaware Alcoholic Beverage Commission.